Filed 12/12/23  P. v. Valle CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KELLY FABIAN VALLE,<br><br>    Defendant and Appellant. | F081260<br><br>(Super. Ct. No. 1407606)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

After a previous confrontation with Christopher Diaz and Mark Ochoa at Diaz's home, defendant Kelly Fabian Valle returned with Eric Arguello, Victor Zapien, Jr., and

David Ferrel, Jr. Defendant, Ferrel, and Zapien were all armed with guns. During the ensuing confrontation, Diaz and Ochoa were shot to death and Diaz's friend, W.H., was also shot at, but he managed to escape. At trial, defendant admitted shooting Ochoa, but testified Ochoa fired the first shot and he fired back. Officer Larry Meyer pursued the group's fleeing truck, and during the pursuit, a passenger of the truck fired gunshots in Meyer's direction. The truck eventually stopped and the occupants other than the driver (Arguello)—defendant, Ferrel and Zapien—exited. They were all ultimately apprehended by law enforcement.

In connection with the incident, a jury convicted defendant of first degree murder of Diaz and Ochoa and found true related Penal Code section 12022.53, subdivisions (d) and (e) firearm enhancements (counts I [Diaz] & II [Ochoa]), two counts of attempted premeditated murder of Officer Meyer and W.H. (counts III [Officer Meyer] & V [W.H.]) and found true related section 12022.53, subdivisions (c) and (e) firearm enhancements, possession of a weapon as an ex-felon (count VII), and active participation in a criminal street gang (count IX). The court found true a section 667.5, former subdivision (b) prison prior allegation. (Undesignated statutory references are to the Penal Code.)

During defendant's trial the Stanislaus County District Attorney's Office started investigating defendant's trial attorney (Frank Carson) for capital murder and other charges. For a month during defendant's trial, the government wiretapped Carson's phone. Carson believed his communications and his investigator's communications had been intercepted, and the court conducted two in camera hearings and accepted the detective's representations that there had been no breach of attorney-client confidences in relation to this case. After the verdicts, Carson withdrew as defendant's counsel and was later charged and acquitted of crimes in connection with the investigation. He ultimately was reinstated as defendant's counsel years later, after Carson was acquitted of the charged offenses.

2.

Defendant challenges his convictions on several grounds. First, he contends the government engaged in egregious misconduct by intercepting confidential attorney-client communications mandating reversal or dismissal of the charges against him. He also asserts insufficient evidence supports his convictions for attempted premeditated murder of W.H. and Meyer (counts III and V); the inclusion of CALCRIM No. 3472 in the jury instructions resulted in a violation of his constitutional rights; the prosecutor engaged in prejudicial misconduct and the cumulative effect of the errors prejudiced him requiring dismissal or reversal. He further argues recent changes in the law, namely Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136), and the California Supreme Court's recent decision in *People v. Tirado* (2022) 12 Cal.5th 688, 692, require reversal of his substantive gang conviction (count IX), the gang-related firearm enhancements, and the prison prior enhancement. He argues the People should be prohibited from retrying the gang-related firearm enhancements on remand but should be allowed to retry count IX.

We reverse defendant's conviction on count IX for active participation in a criminal street gang, the gang-related firearm enhancements attached to counts I, II, III, and V, and the prison prior enhancement (§ 667.5, former subd. (b)) and remand the matter for further proceedings consistent with this opinion. On remand, the People may retry count IX and the gang-related firearm enhancements. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

Defendant and his three codefendants, Zapien, Arguello, and Ferrell, were charged with multiple offenses in relation to a shooting that led to the death of Christopher Diaz and Mark Ochoa and a subsequent shooting at Officer Larry Meyer during their escape. Before trial, the defendants moved to bifurcate the gang allegations and the court denied the request. A mistrial was declared as to codefendant Ferrel midtrial because his attorney was unable to proceed due to medical issues.

3.

*Prosecution Evidence*

**Events Leading Up to the Shooting at Maxine Drive**

W.H. lived around the corner from Christopher Diaz in 2009 and they saw each other daily. They would "[h]ang out, drink beers, [and] smoke weed." They were in a graffiti crew referred to as "BTL." W.H. met Mark Ochoa, whom Diaz referred to as his cousin, while hanging out at Diaz's house. W.H. associated with the Norteño street gang at the time, but he denied being a Norteño. He believed Ochoa also associated with the Norteños, specifically, the South Side Modesto set. W.H. denied still associating with the Norteño street gang at the time of trial and he reported that Diaz did not claim Norteño.

A week before Diaz was killed, Diaz and W.H. were drinking in a park with Arguello, whom they hung out with occasionally and referred to as "Flaco." The police pulled up and started questioning them. The police asked Arguello about the dot tattoos on his hands and Arguello responded that he did not "bang." W.H. was surprised by Arguello's answer and Diaz looked at Arguello "like he couldn't believe it." W.H. believed Arguello identified with the "Norte" gang and Arguello had stated "he was big time." Arguello was always wearing a lot of red. Arguello appeared nervous after the police left. He, Diaz, and W.H. proceeded to meet up with a group outside and were drinking when a fight broke out between a male and Diaz. W.H. ran into the fight. When W.H. and Diaz turned around, Arguello was gone. Arguello did not say anything before leaving; he just took off. W.H. thought Arguello was a fake Norteño given Arguello's previous representations that he was "big time," "down," and "wasn't scared." Diaz called Arguello out a few days later, saying, "'Man, Flaco, you were gone with the wind.'" Arguello seemed bitter. W.H. did not see Arguello again until the night of the murders.

**August 2009 Shooting on Maxine Drive**

On August 31, 2009, W.H. had been at Diaz's house since approximately noon; Ochoa arrived around 3:00 p.m. They were hanging out, drinking, talking, and listening

4.

to music in front of the house of Diaz's neighbor, R.M.  At some point, Arguello showed up with defendant in a red, four-door, F-150 pickup truck.  At trial, W.H. testified defendant and Arguello arrived around 9:00 p.m., but he previously reported to police the initial interaction occurred right before 11:00 p.m.  They parked in front of Diaz's house and got out of the truck.  According to W.H., Arguello and defendant were "drunk" and "belligerent."  Defendant was "[s]loppy," "swaying."  Diaz went over to talk to them.  He was mad because Arguello brought defendant to the house in that condition while Diaz's mother was inside.  W.H. stayed with R.M. in front of R.M.'s house, but he heard them talking.  Arguello invited them to a party.  An argument started and W.H. heard yelling.  He went over to see what was going on.  When W.H. walked closer, he saw defendant "acting hard," staring at Diaz.  Diaz was asking Arguello why he brought defendant over.

Diaz's mother, T.C., was inside the house and heard Ochoa arguing with someone.  T.C. went outside and saw Ochoa and defendant right in front of each other yelling back and forth; Arguello was standing off to the side.  According to T.C., defendant had a shaved head and an "N" tattoo on the back of his head.  Defendant seemed very drunk and angry, and he was asking Ochoa "if he bangs, and he was saying that he was in SPN."  Both T.C. and W.H. testified Ochoa told defendant his name and that "he was from Deep South Side."  T.C. recounted that defendant and Ochoa moved closer toward each other and were chest to chest when T.C. stepped in.  She told them "there's gonna be no fighting here."  Defendant told her, "'Shut up, bitch.'"

At trial, W.H. testified defendant looked at T.C. and was "trying to hit on her."  Defendant said, "'What's up, bitch?'"  However, W.H. had previously reported to Detective Hicks that defendant told T.C., "Shut the fuck up."  W.H. testified Diaz "lost it at that point"; he was ready to fight.  Diaz took off his shirt and said, "'What's up, fool?'"  Arguello backed up and was "kind of laughing."  Arguello said, "'He's drunk fool,'" and that they would leave.  W.H. testified, at that point, defendant turned his attention to Ochoa because Diaz and Ochoa were following him out to the street.  While looking at

5.

Ochoa, defendant said "'What's up, fool? You bang? You bang?'" According to Detective Hicks, W.H. previously reported defendant also asked "if they were active." Ochoa responded, "'Hell, yeah, fool, South Side Modesto, Norte gang.'" Defendant told Ochoa he had never heard of him or seen him, and he was going to "run" his name. Defendant then asked Ochoa for his name and Ochoa responded, "'Sharky, fool. Run it.'" W.H. testified Ochoa was irritated defendant was "calling him on that." Ochoa was ready to fight with his fists up saying, "'Fuck this shit, dude. What the fuck are you about, you know?'" Defendant was laughing like it was a joke and Arguello was backing up toward the truck saying they would leave. W.H. heard defendant say, "'Fuckin' leyvas,'" as they backed up. Defendant was on his phone as he walked behind Arguello back to the truck. Diaz or Ochoa told Arguello not to "'bring that fool back over here.'" Arguello got in the driver's seat of the truck. As defendant got into the truck, he was angry and said, "'We'll be back, fool, we'll be back,'" "'pinta style, mother fuckers.'" Arguello and defendant then left.

T.C. testified Diaz and Ochoa were talking after Arguello and defendant left; they did not seem upset by the interaction with defendant and Arguello. W.H. described the confrontation between defendant and Ochoa as a "personal" issue when he discussed it with Detective Hicks. W.H. denied it was a gang issue; he explained it was related to defendant being disrespectful in front of T.C.

W.H. testified he continued to hang out with Ochoa and Diaz for about an hour. They wanted to smoke, so W.H. went to buy marijuana and went home to change. He was gone for half an hour. Around midnight, as W.H. was walking back, he saw the truck driving in the direction of Diaz's house. W.H. noticed two more heads in the truck and he started running down the street. (W.H. initially reported there were five people in the truck but later stated there were only four.) W.H. saw the truck make a U-turn and park two houses away from Diaz's house. Diaz and Ochoa were in the street and Diaz had his shirt off. Diaz's neighbor R.M. was also there and said he was "'gonna get a

6.

bat'"; he left and did not return. W.H. saw all four doors of the truck open and watched four people get out. According to W.H., Arguello got out of the driver's side, defendant exited the front passenger side, and two men with bandanas on their faces exited the backseat from either side of the truck. The masked man that exited from the rear passenger side had "Mongolian style hair"; W.H. identified him as Zapien at trial. The masked man who exited from the rear driver's side was bald; W.H. identified him as Ferrel at trial. The group walked in a straight line slowly toward W.H., Diaz, and Ochoa.

W.H. testified he, Diaz, and Ochoa were next to each other in the street in front of Diaz's house; Ochoa and Diaz had their fists clenched ready to fight. W.H. believed they were about to have a fistfight; he denied having a gun or seeing Diaz or Ochoa with one that night. Then, defendant pulled out a silver revolver and the two masked men pulled out guns and they started running toward W.H., Diaz, and Ochoa. The man with the Mongolian-style hair had a gun that looked like a black Glock, but it had an extended clip. The other masked man had a dark-colored revolver.

As they approached, W.H., Ochoa, and Diaz "got split up." W.H. backed up and was on the lawn. The masked man with the Mongolian-style hair was pointing his gun at W.H., grabbing W.H.'s shirt, and pushing him back; he was saying, "'Get on your knees, mother fucker.'" The bald masked man "was bouncing around going, 'Where's Chris? Which one's Chris?'" Diaz was backing up towards his driveway. The bald masked man approached Diaz and pointed a gun at him. Ochoa was in the street; he spun around and was backing up with his hands up. Defendant was pointing his gun at Ochoa's face, saying, "'Get on your knees, mother fucker'" and "'What now bitch? What now?'" W.H. could hear Arguello laughing from the street and saying, "'Talk shit now, bitches.'"

Then, W.H. saw defendant shoot Ochoa "[p]oint blank in the chest in the street backing up" with the silver revolver. W.H. testified it was the first shot fired and everybody looked in that direction. Ochoa fell back. W.H. pushed the male pointing the gun at his head and turned and ran, zig-zagging in and out along the sidewalk and

7.

driveways. He heard multiple gunshots fired as he was running; it sounded like they were coming from multiple different guns. W.H. got around the corner and saw a spark; he believed they were chasing him and that he was running for his life as he continued to hear gunshots.[1] W.H. jumped a fence into a yard. He did not hear any more gunshots at that point. W.H. threw up and then peeked back over the fence. He saw the truck pulling up around the corner and he could see the occupants looking around. The truck made a U-turn and left.

W.H.'s mother had been calling him on his cell phone; he returned the call to his mother and told her where he was; she drove up and W.H. ran and got inside the car. W.H. saw a carload of "Nortes" who were members of the LOC gang—Diaz's brother's gang—in front of his mother's car. The occupants asked what happened. W.H. told them he did not know and said, "They fuckin' killed them." The car went looking for the truck. W.H. and his mother drove around the neighborhood before going home. W.H. spoke to Detective Evers about an hour later.

T.C. testified she went inside and went to bed after coming outside during the initial confrontation. She later woke up to multiple rounds of gunshots (though she told Detective Hicks she was awakened by a slamming door). T.C. ran outside into the road and did not see anyone. She ran back towards her house and saw Diaz lying in between cars on the driveway. Diaz was on his back and blood was coming out of his side.

Diaz had seven bullet wounds, including an entrance bullet wound on the back of his right shoulder and another one on the left side of his chest. Another bullet wound was found in the front part of Diaz's right thigh. There were four "through-and-through gunshot wounds." Diaz died from the multiple gunshot wounds to his chest, back, and

---

[1]When asked if he heard gunshots coming at him as he was running, W.H. responded: "I don't recall. I heard multiple gunshots. There was just guns going off." He testified he knew the guns were directed at him '[b]y the judgment [*sic*] of a spark." Detective Jon Evers testified W.H. did not mention during his interview about seeing sparks as he ran away.

extremities.  Four projectiles—large caliber copper-jacketed lead slugs—were recovered during an autopsy of Diaz's body:  one from his right thigh, one from his back, one from his left chest cavity, and one that was located when his jean shorts were removed.  T.C. denied Diaz owned a gun.  She found out after the incident that Ochoa had a gun.

T.C.'s neighbor and his daughter were outside around 10:00 p.m. that night when they saw Diaz and three other males in front of the house across the street.  It looked like the males were about to have a fight when T.C. came outside and told them to leave.  Two of the males left in a red truck.  Then, around midnight, the same neighbor heard gunshots in front of his house.  A man later identified as Ochoa ran into the neighbor's house through the garage door and collapsed in the hallway; he had a gun in his left hand.  He was lying face down and then turned over; he was moaning.  Ochoa asked the neighbor for help; he looked like he had a bullet wound on his side.  Ochoa handed the neighbor a black semiautomatic pistol and told him, "'Get rid of this.'"  The gun was later identified as a Glock; it had an empty nine-millimeter magazine.  The neighbor's wife called 911.

An autopsy of Ochoa's body revealed a bullet wound in his right chest; shell fragments, a possible projectile, a copper jacket fragment and a piece of a bullet were also located during the procedure.  The gunshot wound to Ochoa's chest was determined to be the cause of his death.  A large capacity magazine with 30 live cartridges and a black cellular phone were also recovered from the scene at the neighbor's house.  The neighbor testified his pickup truck and van were parked in the driveway that evening.  The truck was hit by two bullets in the fender and one in the tire.

**Shooting Involving Officer Meyer During Subsequent Pursuit**

Officer Larry Meyer was working the night of August 31, 2009, in a black and white, marked patrol car when he received a radio call regarding several shots fired in northeast Modesto on Maxine Drive.  Meyer started driving in that direction; Officer

9.

Daniel Phillips was traveling in a car behind him. Meyer then received further information by radio that a red Ford pickup truck may be associated with the shots that were fired.

As Meyer was responding to the shooting, he saw at an intersection a red Ford pickup truck matching the description of the vehicle broadcasted on the radio. Meyer broadcasted that he observed a truck matching the suspect vehicle on the radio. With Officer Phillips behind him, Meyer began to follow the truck; he was waiting for backup before making a felony stop. The truck was going the speed limit but then began to pick up speed to 60 mph in a 35 mph zone. The truck proceeded through a stop sign at approximately 60 mph. Meyer put on his emergency lights and siren to pull the truck over and broadcasted on the radio that "they are running." The truck continued driving at 60 mph and did not yield to the emergency lights and siren. As the truck made a right turn on Boston Way, a passenger on the right side of the truck fired two or three shots in Meyer's direction. Meyer saw the muzzle flashes. He was about two to three car lengths away. He backed off and reported over the radio they were shooting at him.

Meyer continued to pursue the truck with his lights and sirens on. The truck eventually pulled over on Sunny Park Drive and three people got out. Officer Meyer testified, when the right rear passenger got out of the truck, he fired two to three more rounds in Officer Meyer's direction. Officer Meyer was in his car approximately three car lengths away. The three individuals that got out of the truck started running westbound behind the houses on that street. Meyer stayed in that location while the truck took off.

Officer Phillips continued to follow the truck after the three people got out. The truck parked in a driveway and Officer Phillips and two other officers approached it. A Hispanic male that Officer Phillips identified at trial as codefendant Arguello stepped out of the driver's side of the truck. Officer Phillips noticed a shell casing in the bed of the

10.

truck later that morning. It was identified as a Smith & Wesson .40-caliber brass shell casing. Two .40-caliber shell casings were found on Boston Way.

Sergeant Aaron Tait was initially dispatched to Maxine Drive but later went to the crime scene at Sunny Park Drive. He located Officer Meyer's patrol vehicle parked on Sunny Park Drive. Law enforcement also located a .40-caliber Smith & Wesson brass casing on Sunny Park Drive and booked it into evidence.

**Apprehension of Defendant, Ferrel, and Zapien**

Sergeant Kelly Scott was tasked with conducting a yard-to-yard search for the truck's occupants that night within a certain given block of a gated residential community around 3:00 a.m. Approximately an hour into the search, he was informed by a tactical officer on a police helicopter of a "heat signature of an unknown object in a backyard" of a residence on Hearthstone Lane. Sergeant Scott went to the residence, knocked on the door, and swept the yard. His team released a police canine into the backyard of the residence and then went back there. Scott moved toward a cardboard box in the middle of the backyard and put his foot inside. He discovered a shirtless man, identified at trial as Zapien, hiding inside and immediately retracted his foot and alerted the other officers. Scott described the individual as a heavier set male with a long, dark ponytail. After Zapien was removed from the box, a cellular phone was also found inside. A black T-shirt was located on a roof line inside that backyard. Zapien had a long "Mongolian-type" ponytail and several tattoos, and he was wearing blue jean shorts and black and white Nike-type shoes. He had abrasions and lacerations on his arms and torso.

Scott's team continued its search of the area and observed the front door of another residence on Hearthstone Lane standing open. They swept the exterior and cleared the interior of the residence. Sergeant Scott was notified by radio that another officer saw someone in the backyard hiding under some debris. Officer Phillip Weber identified the individual as codefendant Ferrel. Photographs of Ferrel depicted him

11.

wearing a red belt that had the buckle "hollowed out so you could see the number 14 in red." Two handguns—Smith & Wesson revolvers—were laying on the ground in the backyard right outside of a glass door; one was stainless steel and the other had a blue or black finish. Six casings were found in the stainless steel Smith & Wesson, indicating the gun had been fired six times; three of the six cartridges in the dark revolver had been fired. Another handgun, a 40-caliber Glock with an extended 30-round magazine, was found later that morning on top of the roof of the residence near the gutter. A red baseball cap with the letters "SF" was also located on some trash cans or bags in the backyard.

Defendant was apprehended nearby on Temescal Drive. He had a buzz cut and a large red "N" tattoo was visible on his head. Pictures of defendant reflected he had a "Ceres" tattoo on his stomach. A .40-caliber Glock magazine loaded with 15 Winchester cartridges and a chair propped next to the south fence were found in the backyard of a home on Temescal.

**Subsequent Investigation**

The prosecution's firearm expert received the four handguns retrieved after the shooting: (1) a .40-caliber Glock Model 22 semiautomatic found on the roof of the home on Hearthstone Lane where Ferrel was apprehended; (2) a .357 magnum Smith & Wesson Model 27 revolver with a black finish found in the backyard of the home on Hearthstone Lane where Ferrel was apprehended; (3) a .357 magnum Smith & Wesson Model 66 stainless steel revolver also found in the backyard of the home on Hearthstone where Ferrel was apprehended; and (4) a Glock Model 27, which was associated with Ochoa. He testified both Smith & Wesson revolvers could fire .38 special ammunition.

The firearms expert concluded eight of the 12 expended cartridge cases retrieved from the Maxine Drive crime scene matched the test fires from the Glock Model 22. The Glock Model 22 test fires also matched the casings found in the 2400 block of Boston

12.

Way, the 2100 block of Boston Way, the 1900 block of Sunny Park Drive, and in the bed of Arguello's truck.

The bullet and jacket fragment retrieved from Ochoa's chest had the combined weight of a single .38- or .357-caliber bullet and could have been shot from either Smith & Wesson revolver. A .38-caliber bullet recovered from the shingles of Diaz's house was consistent with coming from the dark finished .357-caliber Smith & Wesson. The bullet recovered from Diaz's clothing was consistent with a .40-caliber Smith & Wesson bullet; the expert opined it was "highly likely" it was fired from a Glock pistol. Another .40-caliber bullet recovered from Diaz's chest was too deformed for the expert to compare it. The .38-caliber bullets recovered from Diaz's chest and thigh matched the Smith & Wesson Model 27 revolver. Three .40-caliber shell casings found on the 2600 block of Maxine and one located outside of a neighbor's residence matched the Glock Model 27 associated with Ochoa.

The People introduced recordings from phone calls Ferrel, defendant, and Zapien made from jail. Ferrel was recorded stating, "It's all bad," the police found two "heaters," meaning guns, including a long black one; but he did not think the police had found "the other one." Ferrel stated his ".40" was on the roof of someone's house. During another conversation, Zapien told his aunt he "need[ed] a miracle." He promised not to run if she put up her house for bail; he "just need[ed] to get out for a little bit … before it's all bad." He told his aunt he "fucked up." Defendant was also recorded saying, "it's all bad."

**Gang Evidence**

Detective Robert Gumm testified as a gang expert. He testified regarding the history of the Norteño gang and its common signs and symbols. He explained the primary activities of the Norteños include robberies, burglaries, vehicle thefts, and violent crimes such as assaults, assaults with deadly weapons, felony assaults, drive-by

shootings, and attempted murders and murders of rival gang members. He explained Smyrna Park Norteños use the acronym "SPN," and they control the Smyrna Park area in Ceres. "DSSN" stands for "Deep South Side Norteños," also referred to as "Deep South Side Modesto" or "DSSM," which is a subset in south Modesto. Gumm testified the subsets, including Smyrna Park and Deep South Side Modesto, regularly get along but there is some conflict from time to time and Norteños have victimized other Norteños in assaults or even murder. Typically, active Norteños do not fight with other active Norteños; "it's gonna be people that they deem are inactive that are kind of no longer putting in work for the gang." "Respect is everything in the gang," and one's "willingness to put in respect for the gang, especially violent crimes, bring you a higher level of respect because you're willing to do that for the gang." Gang members will respond to disrespect with violence because, if they do not, it shows they are weak and "not handling business," diminishing their strength in the gang.

Law enforcement considers whether an individual meets two of 10 criteria in validating whether someone is a criminal street gang member including: associating with gang members; admitting being a gang member; wearing colors consistent with being in a gang; possessing physical evidence of a gang such as a red or blue rag; being identified by a reliable sources as a gang member; tattoos consistent with the gang; using words, phrases, or terms associated with a gang; being arrested for a crime consistent with gang activity; being found in a judicial proceeding as a gang member; and jail classification as a gang member.

Gumm explained the Deep South Side Modesto set of the Norteños is well-established. If an individual claimed membership but was not actually a member, that person "would be regulated." He discussed a "red-on-red" homicide of Victor Gaona, who was killed because he was claiming Norteño but he was not actually from Deep South Side. He explained the term "leyva" used by a gang member to another person who is claiming gang membership would be considered a "put down." The term "check

14.

up" when an individual claims gang membership means to "use channels such as the shot-caller of that gang to check and make sure that you are part of that gang and not just claiming it"; essentially, checking on one's status in the gang to confirm the person is active. If the check up reveals the person is "no good," the individual would "be regulated or marked for an assault." If the person was determined to be inactive, the gang may also call for a physical assault. If an inactive member disrespected a higher ranking gang member, a violent assault or even murder could be expected.

Gumm investigated defendant using police reports, his contacts from law enforcement, and probation officer reports and determined he matched seven of the 10 criteria used to validate gang membership. He discussed a traffic stop on March 27, 2004, during which defendant was in one of two cars that officers saw racing on a roadway. Defendant was with Luis Gutierrez, Ferrel, and Abel Rodriguez and a stolen .380 handgun was found under defendant's seat; another handgun registered to Gutierrez was found in the glove box. Abel Rodriguez is a "documented Norteño gang member." Gumm testified regarding another law enforcement contact with defendant on May 23, 2004, regarding a noise disturbance. At the time, defendant was wearing a red hat and red shirt; red is consistent with being a Norteño. On July 10, 2004, defendant was alone and driving a speeding truck that police tried to stop. He failed to stop and the police pursued him. During the pursuit, two items were thrown from the vehicle. After the pursuit ended, defendant was uncooperative, and the police located a one-gallon bag of marijuana in the truck; another one-gallon bag of marijuana and a handgun were the items thrown from the truck. Defendant was wearing red and white shoes with red laces on them at the time, and the assigned detective documented that defendant "associates with known gang members." On November 23, 2004, police conducted a traffic stop of a vehicle driven by Hector Lopez, who was wearing a red shirt, and in which defendant and Ferrel were occupants. During the stop, Lopez stated he used to hang out with Norteños but no longer did. Defendant did not admit gang membership but stated he hung out with

15.

Norteños, and Ferrel denied gang affiliation but was wearing a black and red jacket. On June 20, 2006, police contacted defendant with Luis Gutierrez and Timothy McKenzie. At the time, McKenzie was a documented SPN gang member. On August 10, 2006, police conducted a traffic stop of a vehicle driven by defendant; Paul Ramirez and Julian Berrera were occupants in the vehicle. A pair of handcuffs that had been stolen from a police detective were located in the vehicle, and Ramirez reported having seen defendant with the handcuffs before. Defendant denied gang affiliation. He was wearing a red and gray shirt, a red and white A's hat, and red and white Nike shoes. Gumm testified the color of the hat was symbolic of active Norteño gang membership. The officers also documented a large "N" tattoo shaded red on the back of defendant's head with "Hustler" across it. At the time, Berrera was a documented Norteño and Ramirez was documented as a known SPN gang member. On September 19, 2006, defendant was observed by police drinking in Smyrna Park; he was wearing red and white shoes and a red and white hat at the time. On October 27, 2006, defendant and Julian Berrera were contacted in the street by the Central Valley Gang Impact Task Force. Berrera admitted he had been a Norteño for a long time. On May 26, 2007, the chief of police observed several males at Smyrna Park, including defendant, Julian Berrera, Patelio Hernandez, Mark Meyer, Paul Ramirez, Ferrel, Julian Orosco, and Christopher Colon. Colon was an active Norteño gang member at the time and Meyer had a "14" tattooed on him. Officers tried to contact the group and two of the males started to walk away. A "marijuana package for sales was found on the ground next to them." All eight males were detained, and all of them admitted to being Norteños. When defendant was arrested for the current incident, Gumm observed a large block "N" tattoo on the back of defendant's head that is shaded red with "Hustler" across it.

Gumm also investigated the codefendants. He detailed the codefendants' prior contacts with police that related to the criteria used to validate gang membership. Gumm testified regarding a June 12, 2003, incident during which law enforcement was

16.

investigating Manuel Rivera for driving while intoxicated. When the officers attempted to arrest Rivera, he struggled with them and the other occupant of the car started to advance towards the officers before the officers ordered him back into the car at gunpoint. A search was done of the vehicle's occupants including Victor Zapien, and police found a large fixed-blade knife on Zapien. Police also recovered a video camera with footage from that night in which Rivera and Zapien were flashing gang signs and Zapien is heard saying "RNS for life." In the video, Rivera was showing others how to make Molotov cocktails and then they were driving around and getting ready to throw a Molotov cocktail at a house but people were present and they did not throw it. The police recovered a Molotov cocktail from the car consistent with the one seen on the video. Gumm also discussed an October 12, 2003, incident during which there was a disturbance that occurred in a residential area near a wine and cheese festival. Residents of a home, who were admitted Sureño gang members or associates, reported a group of males that included Zapien and Robert Alvarez were yelling at them, "'Fuck you, scraps'" and "'Norte.'" Zapien and Alvarez threw rocks at people in the backyard and Alvarez threw a large chunk of concrete that hit a female in the head.

Gumm discussed Arguello's prior contacts with police, including an incident on August 21, 2009, during which Christopher Diaz and others were present. During the course of the incident, it was documented that Diaz and Arguello were known Norteños. Arguello was wearing a red belt that hung down to his knees and had tattoos of the one and four dots on his right and left hands. Police asked Arguello whether he was a Norteño gang member, and he responded he had been a Norteño for a long time but was not one anymore. Gumm did not think anything would happen to a gang member who denied gang membership in front of other active Norteños.

Gumm also explained Ochoa was field interviewed on December 17, 2006, and was documented as a Norteño based on his self-identification. During an investigation of Ochoa's room related to this case, a hat with "DSSM" written on it, referring to "Deep

17.

South Side Modesto," was recovered. Ochoa also claimed "'Deep'" in a field interview with the sheriff's department.

The People introduced evidence regarding two separate predicate offenses. On February 13, 2007, Zapien, Esteban Zapien, and Anthony Valdobinos were standing outside of a residence yelling, "'This is all about Riverbank, Riverbank Vatos Locos.'" Then, Valdobinos fired a shotgun at the house, striking the house and a vehicle parked outside. After the shooting, Valdobinos's house was searched and police recovered Norteño paperwork with "14," "XIV," "Norte," and "187 scraps" written on it. The prosecution introduced the information and minute order related to the resulting case. The People also introduced the complaint in case No. 09-73110 against Christopher Raymond Colon alleging he committed attempted murder (§§ 664, 187; count 1) on August 29, 2009, with a section 186.22, subdivision (b) gang enhancement, and assault with a knife (§ 245, subd. (a)(1); count 2) with a great bodily injury enhancement (§ 12022.7).

Based on Gumm's investigation and the two predicate offenses, he opined the Norteños are engaged in a pattern of criminal activity. He opined Ferrel, Zapien, and Arguello all met the criteria that validate gang membership. He further opined that all the defendants were active participants in the Norteño criminal street gang at the time of the charged offenses. In reaching his opinion, Gumm considered the circumstances of the incident, including the initial contact Arguello and defendant had at Diaz's house during which Ochoa was asked, "'Where are you from? Are you active?'" This was "an initial gang challenge" to find out if they were active "that set off a chain of events of disrespect." Defendant told Ochoa "he was going to check on him, that he didn't know who he was," and Ochoa responded, "'I don't know who you are either. I'm going to check on you,'" which was a direct challenge to defendant's status in the gang. Gumm testified, by challenging each other's active status, they were disrespecting each other so "there's going to be an assault or some kind of violence." Defendant and Arguello then

18.

left and returned with two other "very violent" gang members, and all of them were armed with guns.

Detective Gumm opined the initial exchange was done in association with the Norteño criminal street gang and the crimes charged in this case promoted or assisted criminal conduct by the gang itself by "taking care [of] what is perceived as a possible threat or an enemy, which are inactives." There were objective signs of gang membership during the incident, including Ferrel wearing a red belt that was 12 inches too long for his body and hung past his knees, and Zapien sporting a Mongolian-style haircut, which is "a Norteño haircut."

**Section 1118.1 Motion to Dismiss**

Defendant's counsel moved to dismiss the attempted murder charge as to Officer Meyer and the section 186.22, subdivision (b) gang enhancements after the People rested. He argued there was no evidence the gun was fired at Officer Meyer. Specifically, "there's absolutely no forensic evidence or anything that indicates that there's any shots directed at him in an attempt to hit him. What you have is you have speeding cars going 60 miles per hour, these things are happening, including the shots out the window in the course of a curve and all that. No bullet strikes on the car, on the pavement, on houses, on anything. There's absolutely nothing to indicate that." He also contended there was no evidence the shooting occurred for the benefit of the gang and that "a shooting occurs in conjunction with some associates[,] doesn't make it within the purview of 186.22."

Zapien's counsel joined in the motion and also sought to dismiss the attempted murder charge as to W.H., arguing there was no evidence W.H. was the subject of attempted murder. Arguello's counsel argued he could not be guilty of attempted murder as to Officer Meyer based on his driving the fleeing car. He argued, for Arguello to be guilty as an aider and abettor he needed to have done more, such as set up the car with the

19.

intent to facilitate the shooting. He also argued there was insufficient evidence to support the gang enhancements; rather, the dispute was personal.

The prosecutor argued there was evidence Meyer saw the gunman point the gun out the window of the truck and shoot multiple shots in his direction; Meyer moved the car to the left and stopped it to avoid being hit; and a .40-caliber shell casing was found in the bed of the truck. There was also evidence when the gunman exited the truck, he turned around and fired again in the direction of Meyer's vehicle. She further argued the crimes were done in association with the gang such that the gang enhancement applied.

The court denied the motion, concluding there was sufficient evidence to send the charges to the jury for their determination.

### Defense Evidence

Defendant testified on his own behalf. On August 30, 2009, defendant went to a friend's house around 9:30 to 10:00 a.m. and started drinking beer; they had a six-pack. The friend's brother invited defendant to a birthday party at a taqueria so they left and went to the party around 12:30 p.m. Defendant was drinking and eating and met Arguello at the party later that afternoon around 3:00 or 4:00 p.m. Arguello's family owned the restaurant and Arguello was working the cash register. Arguello asked defendant if he wanted to join him to get cigarettes at the store and defendant agreed. Arguello was drunk at that point and defendant was also intoxicated. After they went to the store, they went to Arguello's "friend's house" to invite him to come to the birthday party. Defendant testified he was carrying a .357-caliber, six-shot, silver Smith & Wesson Model 66 revolver that night. He normally carried a gun for protection even though he is not supposed to have one. He admitted he was an active Norteño gang member at that time, and he had an "N" tattoo on the back of his head.

They pulled up, got out of the truck, and walked towards Diaz's house. Defendant testified he now knew the males in front of the house to be Diaz, Ochoa, R.M., and W.H. Arguello started talking to Diaz and invited him to the party. Defendant shook hands

20.

with the other males there and told them his name and he was from Ceres. After defendant introduced himself, Ochoa was "trying to find more stuff out." He was moving closer to defendant. Defendant held his ground and they continued talking aggressively. At one point, defendant thought they were going to fight. Defendant initially denied asking Ochoa any questions but later testified he thought he asked Ochoa where he was from. He admitted he was drunk and likely speaks louder when he is drunk. Ochoa told defendant his name and where he was from.

Meanwhile, Diaz went into the house and then came back out with a semiautomatic gun in his hand. Diaz kept the gun at his side and said, "'You guys better leave.'" T.C. came out a few seconds after Diaz. When Diaz heard her coming out, he put the gun away in his waistband. T.C. said, "'You guys need to leave now. Leave my house now.'" She was mad and yelling. Defendant and Arguello turned around and left. Defendant denied making any threats, saying he was going to "check" Ochoa out, or stating they would be back, "pinta style." He also denied being upset about being asked to leave, though he did not understand what he did wrong.

When defendant got in Arguello's truck, he called Ferrel because he was supposed to pick him up to come to the party. Defendant had known Ferrel for eight or nine years. Defendant had met Zapien "a couple years before" and met him a few times. Defendant testified both Ferrel and Zapien were Norteños at the time.

Ferrel was not answering, so defendant called Zapien. Zapien was with Ferrel. Defendant and Arguello went to pick them up. On their way to the party, defendant told Arguello to go back to Diaz's house. Defendant wanted to "go fight one of those guys." He denied intending to kill anyone. There was no discussion about whether anyone was armed, but it was common for gang members to pack a gun. Defendant knew Ferrel owned a black handgun—the .40-caliber gun that was found on a roof that night. Diaz told the others that the guys there "were on [him]" earlier. When they got to Diaz's street, Zapien said he knew the guy who lived there. As they arrived at Diaz's house,

21.

Zapien said, "'Don't worry about it. I'm going to take care of it. I'm going to talk to this guy. He's cool. Don't worry.'"

The four of them got out of the truck and walked on the sidewalk. Ferrel and Zapien were in front and defendant and Arguello were walking behind them. As they were walking up, Zapien asked, "'Where's Chris?'" Defendant did not recall W.H. being there. Ochoa was on the grass and Diaz walked toward Zapien and they exchanged a few words. Then, defendant heard a gun rack and Ochoa said, "'What's up?'" Ochoa fired the first shot in defendant's direction and Diaz also pulled out a gun. Defendant pulled out his silver revolver and shot back at Ochoa four or five times. He believed he hit Ochoa once. He denied shooting him "point blank" or that anyone was saying, "Get down on your knees." He testified he shot at Ochoa because Ochoa shot at him. Ochoa began to run across the street, shooting at the same time. Ochoa was shooting at defendant the whole time he was running, approximately four or five shots. Defendant was not chasing Ochoa but instead was running back to the truck; he denied shooting Diaz at any point. Defendant testified he only shot Ochoa to defend his own life and he felt bad about it. He denied it had anything to do with the Norteño gang.

Defendant got in the front passenger seat of the truck, Ferrel was behind him, Arguello was in the driver's seat, and Zapien was behind Arguello; they drove off. He denied the truck drove around looking for W.H. As they were driving, they saw a lot of police cars going past them. Eventually, a police car got behind them and turned on its headlights and sirens. They started to drive faster. There was a quick five- to 10-minute chase, though it seemed like a long time. They were making turns and defendant was in the front telling Arguello "'Oh watch out' or 'turn here,' kind of trying to help him out." As the truck was making a turn, defendant heard one or two gunshots and saw a gun pointing upwards in front of his window. He believed the gun was fired straight up into the air. The truck stopped and defendant, Zapien, and Ferrel got out; defendant did not see anyone turn and shoot at the police officer. They ran towards the houses and jumped

22.

the fence. As they were jumping to climb the fence, defendant heard someone fall and a gun go off; defendant believed it was Ferrel's. After jumping the fence, defendant was by himself in a backyard; he did not know where the others went. He kept running and jumping fences. He ended up seeing Ferrel and Zapien in another backyard, dropped his gun so he could climb the fence, and continued into another yard. Eventually, the police caught them all.

Though a mistrial was declared for Ferrel, Ferrel still testified on behalf of the defense. On August 30, 2009, Ferrel had been drinking all day with Zapien and another person; it was his 30th birthday the next day. Defendant told Ferrel about a party and arrived later to pick up Ferrel and Zapien. Before leaving, Ferrel grabbed his Glock .40-caliber handgun with an extended clip, a 30-round magazine; he always took his gun for protection when he left the house.

As they were driving, Ferrel thought they were headed to the party. When they pulled onto Maxine Drive, Ferrel and Zapien asked if the party was there and stated they knew the guy who lived there; Ferrel had met Diaz once before. They got out of the car and walked up to Diaz's house; Zapien was saying, "'Where's Chris? Where's Chris?'" He denied any of them were wearing a mask. Diaz walked to the middle of the driveway, shook hands with Zapien, and they started talking; there were two other guys "minding their own business" on the other side of the cars. Ferrel saw someone who he could now identify as Ochoa running from the side of the house, racking a gun, and saying, "'What? What? What's up?'" Ferrel heard a gunshot and saw a flash out of the corner of his eye. He saw Diaz turn and pull out a big gun. Ferrel pulled out his gun and shot at least six times in Diaz's direction because he did not want Zapien to be shot. Then, Ferrel ran back to the truck and got in the back passenger side.

When everyone got back in the truck, they left. As they were driving, at some point a police car turned on its lights and sirens behind them. The truck sped up. Ferrel put his hand out the window and shot two or three times in the air; he denied turning

23.

around and aiming or shooting at the police officer. The police car "backed up" and the truck made a few more turns. They decided to get out because they could not see the police car anymore. Ferrel jumped out of the truck and started running. He denied shooting at any officers when he got out of the car; he testified "the cops were barely turning around the corner; so they were still far away." He hoisted himself over a fence, fell to the ground, and his gun went off. He unloaded the gun because he realized he almost shot himself and kept running. He saw defendant and Zapien again and they went into a backyard. He realized he could not get out of the backyard because he could not move his arm as he injured it in the fall. The others left and he saw the police out front when he looked around the corner of the house. Ferrel realized he still had his pistol so he threw it on top of the house. He crawled inside a roll of carpet where he was caught and arrested. He testified he did not realize Ochoa or Diaz had been shot that night until he saw it on the news the next day. Ferrel testified he is a Norteño; however, he denied the charged offenses were gang related.

Detective Phillip Weber testified regarding two text messages from Zapien to Diaz in the early hours of August 30, 2009. In the first message, Zapien indicated he had "yayo," which Weber explained "was slang for cocaine." In a subsequent message, Zapien wrote "C wats good wit that 45. I got loot and a 9." Weber also discussed previous messages from Zapien that month to other recipients in which he indicated he was selling several guns and was interested in trading or buying a gun.

The defense presented testimony from Jacobus Swanepoel, a retained criminalist and firearms expert. Swanepoel opined that a fragment collected at the crime scene had probably come from a .45-caliber bullet, which was unlikely to have been fired from any of the four guns seized by police. However, he could not rule out the possibility that, as the prosecution's expert believed, the fragment had come from a .40-caliber bullet.

24.

*Second Section 1118.1 Motion to Dismiss Following Close of Evidence*

After both sides rested, defendant's counsel renewed his earlier motion to dismiss the gang enhancements. He challenged Detective Gumm's contention the charged offenses were done "in association" with the Norteño gang and instead argued this was a "personal issue." The prosecutor argued the actions were done in association with the gang to willfully promote felonious criminal conduct by the gang. The court concluded there was sufficient evidence for the enhancements to go to the jury and denied the motion to dismiss.

*Verdict*

The jury convicted defendant, Zapien, and Arguello of intentional, deliberate, premeditated murder of Diaz (count I) and Ochoa (count II) and found that defendant, Zapien, and Arguello were principals in the offenses and violated section 186.22, subdivision (b) and at least one of the principals in the offenses personally and intentionally discharged a firearm and proximately caused great bodily injury, as defined in section 12022.7, or death to any person other than an accomplice pursuant to section 12022.53, subdivisions (d) and (e). However, as to counts I and II, the jury found not true allegations the offenses were gang related pursuant to section 186.22, subdivision (b)(1); are special circumstances within the meaning of section 190.2, subdivision (a)(3) and (22); defendant intentionally killed the victims while the defendant was an active participant in a criminal street gang as defined in section 186.22, subdivision (f).

The jury also convicted defendant, Zapien, and Arguello of intentional, deliberate, and premeditated attempted murder of Officer Larry Meyer (count III). It found true allegations Larry Meyer was a peace officer/firefighter at the time of the offense and that defendant, Zapien, and Arguello, were principals in the offense and violated section 186.22, subdivision (b) and that at least one of the principals in the offense personally and intentionally discharged a firearm and proximately caused great bodily injury, as defined in section 12022.7, or death to any person other than an accomplice pursuant to

section 12022.53, subdivisions (d) and (e).  The jury found not true an allegation count III was committed for the benefit of, at the direction of, or in association with the Norteño criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members pursuant to section 186.22, subdivision (b)(1).  The jury found defendant, Zapien, and Arguello not guilty of the second count of attempted murder of Officer Larry Meyer alleged in count IV.

The jury also convicted defendant, Zapien, and Arguello of intentional, deliberate, and premeditated attempted murder of William W.H. (count V) and found true allegations that defendant, Zapien, and Arguello were principals in the offense and violated section 186.22, subdivision (b) and that at least one of the principals in the offense personally and intentionally discharged a firearm and proximately caused great bodily injury, as defined in section 12022.7, or death to any person other than an accomplice pursuant to section 12022.53, subdivisions (d) and (e).  The jury found not true an allegation count V was committed for the benefit of, at the direction of, or in association with the Norteño criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members pursuant to section 186.22, subdivision (b)(1).

The jury also convicted defendant of being a felon in possession of a firearm in violation of Penal Code former section 12021, subdivision (a) (count VII) and convicted defendant, Zapien, and Arguello of active participation in a criminal street gang in violation of Penal Code section 186.22, subdivision (a) (count IX).  Arguello was also convicted of evading a police officer in violation of Vehicle Code section 2800.2, subdivision (a) (count VI).

***Postverdict Proceedings***

A court trial was held on defendant's priors on April 21, 2014.  The court found true an allegation defendant suffered a section 667.5, former subdivision (b) prior

conviction as alleged in the information and the matter was referred to probation for sentencing.

A sentencing hearing was initially set for May 20, 2014, but the matter was continued to June 11, 2014, in light of a motion to compel discovery filed by defendant. The motion sought to compel production of (1) "An inventory and transcript of all wiretapped communications of [defendant's counsel Frank Carson] and/or [his] office intercepted during the duration of [defendant's] trial from May to October 2012" and (2) "An inventory and copies of any and all emails intercepted or received during the duration of [defendant's] trial whether from or to [Frank Carson] or investigator Jack Able and his associates" and any related law enforcement reports, notes, or summaries. In the memorandum in support of the motion, Carson explained he was "exploring a motion for a new trial based on the misconduct of the District Attorney during trial and the repeated purposeful breach of the attorney/client and work product privilege that denied defendant a fair trial."

Carson filed a declaration in support of the motion to compel, averring he became aware his communications were being intercepted during the trial "because of developments that corresponded with what [he]'d discussed via phone calls that led [him] to believe the government knew of efforts [he] was making to develop witness[es] and defenses to charges." He asserted his "investigator's e-mails were intercepted by the District Attorney's Office concerning a possible cell phone expert opining as to what the records would show of the location of the principal prosecution witness … [W.H.] before and after the shooting." He stated his "investigator Jack Able was shown his private generated e-mail by District Attorney investigators questioning him not long ago concerning this issue." He further averred: "During the course of the almost 6 month trial, I spoke extensively about the case via phone with colleagues, investigators, and witnesses. [¶] Developments in the trial were indicative of my confidential communications being compromised."

27.

The People opposed the motion and attached a declaration of Detective Jon Evers to their response. In part, Evers averred he was assigned to assist a multiagency investigation into the murder of Korey Kauffman and, as part of that investigation, "there was a wire intercept order that ended on July 21, 2012." He reiterated the court previously conducted an in camera hearing during which Evers testified regarding these issues and the issue was previously decided. Evers further discussed a request by defense investigator Jack Able on an Internet Web site made 10 days after the wire intercept concluded, "making it impossible for this communication to have been intercepted during the course of this wiretap." He affirmed that an interview was conducted with Jack Able on November 12, 2013, during which Able confirmed he was investigating "the missing persons case of Korey Kauffman on behalf of Frank Carson" and he "confirmed he sent the email/posting to his list serve members on July 31, 2012," and that it related to the Kauffman case.

At the hearing on June 11, 2014, Carson explained that during trial, he expressed to the court there were "indicators" his "communications were being intercepted." Carson contended "the privilege for law enforcement" (Evid. Code, § 1040) had been waived as a result of Evers's averments in his declaration, and he should have the right to cross-examine Evers. The court held another in camera hearing with Detective Evers regarding whether confidential communications were intercepted. It concluded afterwards it was satisfied there was "absolutely nothing to disclose." Accordingly, the court denied the motion to compel discovery and stated it would proceed with sentencing.

At that point, Carson stated he would need to withdraw from the case as defendant's attorney; he would not "proceed any further" because he could not "ethically." Carson stated, "I can't proceed and continue representing my client if I'm in possession of information that I can't impart until, as I would like to, if I'm aware of facts that directly would help him." "[R]ather than proceed when I know that I am constrained from helping my client to the fullest extent that I can or that I should be able to, then, …

28.

at this juncture what I'd like to do is consider, so that I can either brief this or, again, consult, get an ethics ruling on this thing about what I can disclose and what I need to do, consider withdrawing." Carson told the court to proceed with sentencing Arguello and Zapien and that he would come back in a week or two for defendant's sentencing.

Prior to a July 11, 2014, hearing, Carson filed a motion to withdraw based on a conflict of interest he alleged prevented him "from filing the necessary and appropriate motion for a new trial; based on counsel's representation being compromised by police and prosecutorial misconduct and breach of the attorney/client and work product confidences." At the hearing, the court granted Carson's motion to withdraw and indicated attorney John Hillenbrand would be appointed as replacement counsel. Carson was subsequently charged with murder in 2015 and acquitted of the charges in 2019.

Hillenbrand made an appearance three days after being appointed as defendant's counsel and asked to continue the matter for 10 days. At the next hearing, Hillenbrand indicated he needed more time to review the file and asked to put the matter over until September. At the September hearing, counsel requested a further continuance until November 2014. Then counsel requested an additional continuance in November and stated the transcript he received was incomplete as it did not include any of the hearings outside of the jury's presence. The matter was reset for January 2015. Sentencing was ultimately continued further and, in August 2015, defense counsel Hillenbrand filed a motion to compel discovery related to a district attorney investigator, Detective Evers, and Detective Frank Navarro's entry of Carson's office on August 9, 2012, documents related to electronic surveillance of Carson in 2012, and documents related to the interceptions of communications of Frank Carson and his investigator Jack Able. The People opposed the motion, denying the request was supported or that there was governmental interference. Specifically, they argued, "[w]hile investigation of Defendant's former defense counsel occurred, there was no information obtained related to the instant case, nor was any information shared with the prosecutor in this matter."

Additionally, "[d]efendant does not suggest that this evidence would relate to his guilt or innocence and merely speculates this evidence may have played a role in his representation," and "there is a legitimate government interest in maintaining the integrity of the investigation into the murder of Korey Kauffman."

In March 2016, a declaration by defendant was filed with the court in which, among other things, defendant averred Carson never advised defendant during Carson's representation of him that Carson was under investigation by law enforcement or that he believed his phones were being tapped and his conversations monitored during the time he represented defendant. Defendant averred he believed his defense was compromised by the lack of disclosure and that Carson was conflicted and defending himself during the trial. At the related hearing, defense counsel Hillenbrand stated the declaration would be an essential part of the motion for new trial and he requested an additional continuance.

At a subsequent hearing on May 23, 2016, Hillenbrand declared he had "multiple conflicts" he discovered while preparing the motion for new trial and could not "ethically proceed with this motion." On May 25, 2016, Alonzo Gradford was subsequently appointed as counsel for defendant, but he reported at the next hearing he could not accept the appointment after all. The next appointed attorney was also relieved based upon a conflict of interest. Defendant was eventually represented by Lewis Wentz and the sentencing hearing was again continued multiple times. Finally, Frank Carson substituted back in as counsel in July 2019.

**Motion for New Trial**

Carson filed a motion for new trial on defendant's behalf detailing law enforcement's actions against Carson in relation to the murder charge ultimately brought against him, which was prosecuted by Marlisa Ferreira, the prosecutor in defendant's trial. The motion alleged, in part:

> "On July 15, 2012, law enforcement from several agencies executed search warrants at several of Mr. Carson's properties with cadaver-sniffing dogs.

30.

Prior to that, interviews had been conducted with Mr. Carson's step daughter … and [an] employee ….  Marlissa Ferriera [*sic*] on her own conducted surveillance of the Carson family members and went to Manteca, California, to interview an antique store owner about Mr. Carson and his wife.  Ms. Ferriera [*sic*] passed herself off as an acquaintance of the Carson's. On August 9, 2012, as Mr. Carson was preparing for trial, District Attorney Investigator Kirk Bunch, Turlock Police Officer Frank Navarro, and Modesto Police Officer Jon Evers invaded the law office of Mr. Carson and refused to leave.  The officers searched the outgoing addressed mail on the front desk in Mr. Carson's office.  Mr. Carson had to call 9-1-1 and get the assistance of the Modesto Police Department to throw the rampaging officers out of the office.  The officers did not have a warrant for their actions.  Moreover, from June 21, 2012, through July 21, 2012, they wiretapped Mr. Carson's phone based on his being a murder suspect in the disappearance of Mr. [Korey] Kauffman.  Mr. Carson and others suspected of being involved were arrested on August 14, 2015, for the murder of Mr. Kauffman.  Mr. Carson was found not guilty of that alleged murder on June 28, 2019.  The prosecution attorney was Marlissa Ferreira [*sic*].  <u>She's the same prosecutor who prosecuted [defendant]</u>.  Ms. Ferriera [*sic*], in the course of the preliminary hearing against Mr. Carson (2015–2016), said that investigative work completed by Jack Able and Associates, an investigative firm Mr. Carson employed, was <u>*not*</u> done for [defendant]'s case, but rather the investigators Mr. Carson employed were actually tracking the Kauffman investigation.  Ms. Ferreira asserted Mr. Able, Carson's private investigator was hired 'for an illicit purpose not for a legitimate purpose ….'"  (Underscoring and italics in original.)

The motion for new trial also alleged defendant "was not properly informed about the dire, conflicted situation his attorney was in nor did he waive the conflict or weigh the possible alternatives that may have been available to him."  A declaration by Carson was attached to the motion for new trial in which Carson averred he never told defendant during his representation that he was a murder suspect under investigation by the district attorney's office and the "conflict of interest" "greatly distracted [him] during the course of the trial."  He asserted, he "was fearful that questions [he] was asked at trial might be perceived as having an ulterior purpose for [his] own benefit in the case for which [he] was personally suspect," and he "regret[ted] [his] failure."  Defendant's March 2016 declaration was also attached to the motion in which he averred Carson never advised

31.

him he had a conflict or potential conflict with the office of the district attorney, and he believed his defense was compromised by the lack of disclosure and that Carson "was defending himself as well as [defendant] as the trial proceeded." Defendant filed a separate request for the court to take judicial notice of Stanislaus Superior Court case No. 1490969, *People v. Frank C. Carson*, *et al.*

The People opposed the motion and argued defendant could not establish he was prejudiced by any alleged conflict. They also contended "several accusations in [defendant's] statement of facts" were "not supported by declarations under penalty of perjury." They argued Carson informed the court in defendant's presence that he was subject to wiretaps and had investigators arrive at his office to investigate. They argued, moreover, the evidence supporting defendant's guilt was "overwhelming" and defendant failed to establish ineffective assistance of counsel.

At the hearing on the motion for new trial in January 2020, Carson argued there was an inherent conflict and defendant could not have gotten a fair trial as a result. The court denied the motion for new trial, finding "the evidence was overwhelming," and noting both of the codefendants were also convicted and their convictions survived the appeal process. Additionally, the court stated, after observing Carson's performance at trial, it did not occur to the court at any time that Carson was not "performing at 100 percent by any means at all."

### *Sentencing*

The court sentenced defendant to 25 years-to-life on count I plus a consecutive 25-year-to-life term for the section 12022.53, subdivisions (d) and (e) enhancement; a consecutive 25-year-to-life term on count II plus a consecutive 25-year-to-life term for the section 12022.53, subdivisions (d) and (e) enhancement; consecutive 15-year-to-life terms on count III and V, plus consecutive 20-year terms for the section 12022.53, subdivisions (c) and (e) enhancement; a consecutive term of eight months (one-third the midterm) on count VII; and a stayed term of two years (one-third the midterm) on count

IX, plus a one-year consecutive term for the section 667.5, former subdivision (b) enhancement.

## DISCUSSION

### I. Government Did Not Engage in Misconduct that Violated Defendant's Constitutional Rights or Mandates Reversal

Defendant first contends the government engaged in egregious misconduct by intercepting attorney-client communications and creating a conflict that forced his counsel to withdraw. He argues reversal or dismissal is required because the misconduct violated his Sixth Amendment right to counsel and his due process and fair trial rights. The People disagree.

#### A. Relevant Factual and Procedural Background

On August 20, 2012, the 43d day of trial, defendant's attorney, Carson, notified the court he had reason to believe his phone was being wire-tapped and asked the court to inquire of the district attorney's office whether his communications were being intercepted. Carson explained, he was discussing impeachment of one of the experts in this case and that evening Detective Evers and the district attorney's investigator Kirk Bunch and "Frank Navarro out of Turlock wound up in the lobby of [Carson's] office looking at the mail that was on a front desk." Carson asked the court to obtain a representation from Detective Evers about whether Carson's "communications have been compromised." The prosecutor, Ferreira, stated she did not have any wiretaps going on and did not know of any, but she would not be privy to that information if it was not her wiretap. She represented she had spoken with her boss and her chief deputy, and she was not informed of an ongoing investigation involving Carson. Carson responded Ferreira also had represented to him she had no knowledge of a wiretap and he accepted that. But he urged the court to inquire of Detective Evers if he is aware "of this kind of monitoring." The court scheduled an Evidence Code section 402 hearing with Detective Evers.

33.

At the hearing, Carson asked Detective Evers if he was aware of any electronic monitoring of "any of the attorneys sitting at counsel table" in 2012. Detective Evers responded "that is privileged information" and requested "an in-camera hearing" under Evidence Code section 1040. The court held an in camera hearing and, after the hearing, the court found "that a privilege does exist for the detective." The court explained its only concern was "whatever might occur relative to this particular case and that's what it was limited to, whether any kind of attorney-client privilege has been breached in any fashion." The court explained it examined Detective Evers "extensively to ascertain that … no confidential telephone calls were received between [Carson], [defendant], and investigator, or anybody or anything associated with this case, and that held true for all the defendants and all of the parties in this particular case." The court concluded after "extensive questioning of the detective, [it was] convinced that positively that this has not occurred."

Carson expressed his concern "that the only representations this Court's basing its decision on are the ones from Detective Evers," and that the defense was prepared to impeach Detective Evers "based on a continuing course of conduct." Carson asked the court to order "these intercepts be preserved and they could be under seal initially" and "that there be an inventory, then the Court can test the veracity of whatever representations are being made." The court declined counsel's suggestions and reiterated it had questioned the detective extensively to make absolutely certain there were no compromises made in this particular case at all. The court stated it was "absolutely satisfied there's been no sort of breach in any communications" of Carson, defendant, his investigators, any experts, or anything relative to this case and "that holds true for all the defendants, all the defense attorneys." The court further confirmed Detective Evers also "had no communication with Ms. Ferreira on the issue."

As discussed, thereafter in July 2014, after the jury's verdict in this matter and before sentencing, Carson moved to withdraw. He was subsequently arrested, tried, and

acquitted in connection with the Kauffman murder. Following his acquittal, Carson was reinstated as defendant's counsel and filed a motion for new trial on defendant's behalf in July 2019.

### B.      Analysis

Defendant argues the behavior of the district attorney's office "shocks the conscious [*sic*]," and "the charges should be dismissed or the judgment reversed and the matter remanded for a new trial with conflict-free counsel."

### 1.      *Defendant's Right to Counsel Was Not Violated*

Defendant argues the government's misconduct led his counsel to withdraw, thereby violating his right to counsel. He further contends the "government here egregiously interfered" with his "attorney-client relationship and right to counsel by tapping Carson's phones, and creating such a conflict for Carson," defendant's chosen attorney, that Carson "and six other lawyers were forced to withdraw from [defendant]'s case, causing substantial delay and leaving [defendant] without unconflicted counsel for six long years." (Boldface omitted.) In supplemental briefing, defendant further contends his right to retained counsel of his choosing was violated on this basis.

Initially, we cannot conclude defendant's Sixth Amendment right to counsel was violated. "[A] court properly rejects a Sixth Amendment claim based on surreptitious state participation in communications between a defendant and his or her attorney or the attorney's agent when the record demonstrates there was no realistic possibility of injury to the defendant or benefit to the prosecution." (*People v. Alexander* (2010) 49 Cal.4th 846, 888–889; accord, *Weatherford v. Bursey* (1977) 429 U.S. 545, 552 ["when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial"].)

In *People v. Alexander*, *supra*, 49 Cal.4th 846, the California Supreme Court reviewed the denial of a motion to dismiss based upon the monitoring and recording of a telephone call involving the defendant, his mother, and a defense investigator during which "several subjects concerning the trial were discussed, including potential defense witnesses and how the defense might respond to the prosecution's evidence." (*Id*. at p. 884.) Before jury selection began in the *Alexander* trial, the prosecution obtained a warrant authorizing law enforcement agents to monitor and record conversations from but not limited to the home of the defendant's parents to attempt to prevent intimidation or dissuasion of witnesses in the defendant's case. (*Ibid*.) In addressing the defendant's claims, the *Alexander* court perceived "five distinct possible grounds for claims of error: (1) a statutory violation of Evidence Code section 954, the attorney-client privilege; (2) a violation of his federal Sixth Amendment right to counsel; (3) a violation of his federal Fifth Amendment due process right to a fair trial; (4) a violation of his federal Fifth Amendment right to substantive due process; and (5) a violation of his state constitutional right to counsel." (*Ibid*.)

The *Alexander* court rejected the defendant's claim the interception violated the statutory attorney-client privilege, reasoning the defendant had "made no showing that any witness disclosed any information from the call during the proceedings in violation of Evidence Code section 954." (*People v. Alexander*, *supra*, 49 Cal.4th at p. 887.) Substantial evidence supported the trial court's findings the calls' contents were not disclosed to the prosecutors. (*Ibid*.) The *Alexander* court further held interception of attorney-client communications does not constitute a complete denial of the right to counsel; rather, "unless the record supports 'at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation.'" (*Alexander*, *supra*, at p. 888; accord, *Weatherford v. Bursey*, *supra*, 429 U.S. at p. 558.) The *Alexander* court further concluded, even assuming the defendant's state right to

counsel had been violated, the defendant could not show a reasonable probability he would have obtained a more favorable result absent the violation. (*Alexander*, at p. 899.)

Here, as in *Alexander*, at no point during the trial, the hearing on the motion for new trial, or in this appeal has defendant identified any specific evidence the prosecution offered that he suspects was developed because of intercepted communications. (See *People v. Alexander*, *supra*, 49 Cal.4th at p. 889.) And, notably, "this is not a situation where the State's purpose was to learn what it could about the defendant's defense plans and the informant was instructed to intrude on the lawyer-client relationship or where the informant has assumed for himself that task and acted accordingly." (*Weatherford v. Bursey*, *supra*, 429 U.S. at p. 557.) Rather, there is no evidence any of the information gained from the wire interceptions, including any alleged confidential attorney-client communications, was possessed by or communicated to the prosecutor. (See *id.* at pp. 556–557 ["As long as the information possessed by [the undercover agent] remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights. Nor do we believe that federal or state prosecutors will be so prone to lie or the difficulties of proof will be so great that we must always assume not only that an informant communicates what he learns from an encounter with the defendant and his counsel but also that what he communicates has the potential for detriment to the defendant or benefit to the prosecutor's case"].)

Additionally, even assuming, arguendo, there was a breach of attorney-client confidences amounting to a violation of defendant's state right to counsel—of which we note there is no evidence—as in *Alexander*, we also cannot conclude reversal or dismissal is warranted. (See *People v. Alexander*, *supra*, 49 Cal.4th at p. 895.) Here, defendant "had counsel, and his attorney vigorously pursued his interests throughout the trial." (*Alexander*, *supra*, at p. 896; accord, *People v. Delgado* (2017) 2 Cal.5th 544, 567–568 [noting "defense counsel actively participated in all aspects of the trial, including jury selection, challenging evidence admissibility, cross-examining witnesses, proposing jury

instructions, presenting defense witnesses at penalty phase, and arguing vigorously against a sentence of death"].) And, as discussed, there is no evidence the prosecution gained anything from the interception of any calls. Nor is there any evidence defendant was affected negatively in a way that could have changed the trial's outcome (counsel's unsupported assertion notwithstanding). (See *Alexander*, at p. 899.) Indeed, the record does not show the government's conduct "impaired the preparation of [the] defense or aided the state's presentation of the evidence against [the defendant]." (*People v. Suarez* (2020) 10 Cal.5th 116, 183.)

Defendant's reliance upon *Barber v. Municipal Court* (1979) 24 Cal.3d 742, 752 (*Barber*) to argue reversal or dismissal is required is misplaced. In *Barber*, an undercover police officer posed as a codefendant and attended attorney-client meetings. (*Id*. at pp. 745, 747–749.) During that time, the agent communicated regularly with his superior officers and disclosed that "the defense was to become more 'political.'" (*Id*. at p. 749.) The petitioners learned of the breach in attorney-client confidences before the date set for trial and they moved to dismiss the charges on the grounds the presence of the agent at confidential attorney-client meetings had deprived them of their rights to effective assistance of counsel and due process of law. (*Id*. at p. 745.) Their attorney testified his clients became "'paranoi[d]'" after learning they had been infiltrated by an informant, and the breach had a demonstrated chilling effect on attorney-client communications. (*Id*. at pp. 749–750, 756.) Specifically, the petitioners became reluctant to speak though they had actively participated in meetings before and they were distrustful of each other and of defense counsel's assistant. (*Ibid.*) Defense counsel opined, accordingly, his clients' ability to assist in preparing a defense had been "'substantially impaired.'" (*Barber*, at p. 750.) On that record, the California Supreme Court concluded the government's action violated the right to counsel and the only effective remedy was dismissal of the underlying charges. (*Id*. at pp. 759–760.) The

38.

*Barber* court held "[t]he right to counsel … is violated when a state agent is present at confidential attorney-client conferences." (*Id*. at p. 752.)

As the California Supreme Court explained in *Alexander*, "*Barber* involved an application for a pretrial writ of prohibition, while the present case is an appeal from a judgment of conviction and sentence." (*People v. Alexander*, *supra*, 49 Cal.4th at p. 896; see *People v. Delgado*, *supra*, 2 Cal.5th at p. 567.) Accordingly, the present case is subject to article VI, section 13 of the California Constitution: "No judgment shall be set aside … for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (See *Alexander*, at p. 896; *Delgado*, *supra*, at p. 567.) And, as discussed, there is no evidence or basis to conclude the prosecution benefited from or the defense was harmed as a result of interceptions of privileged communications. Furthermore, in *Barber*, there was evidence the defendants "'[had] been prejudiced in their ability to prepare their defense'" after they learned a undercover officer had been in their midst." (*Alexander*, *supra*, at p. 895; see *Barber*, *supra*, 24 Cal.3d at p. 756.) Whereas here, there is no such evidence the alleged interception had a "chilling effect" on defendant's relationship with counsel. Carson expressed his suspicions regarding his communications being intercepted in open court when defendant was present, and there was no evidence their relationship had become strained at any time.[2] Furthermore, the interceptions here were not the result of

---

[2]Notably, despite the discussions in open court during which defendant was present, defendant averred in his declaration below that Carson never advised him he believed his phones were tapped or that his conversations were being monitored during his representation of defendant. Defendant also stated he did not understand the significance of the wiretap discussion to his rights when it was discussed or hear the court address how the wiretaps and Carson's concerns affected his rights. Defendant's representations, thus, further belie his contention on appeal that his relationship with counsel was affected during counsel's representation based on the alleged interception of privileged communications.

"trickery" as in *Barber*, but rather "occurred pursuant to a judicially approved warrant" as in *Alexander*. (*Alexander*, *supra*, at p. 895.) Thus, *Barber* is inapposite.

We also cannot conclude alleged governmental misconduct resulted in a violation of defendant's right to retained counsel of his choosing. It is true "[t]he right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing. [Citations.]' [Citation.] Underlying this right is the premise that 'chosen representation is the preferred representation. Defendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' [Citation.]" (*People v. Courts* (1985) 37 Cal.3d 784, 789.) But here, Carson moved to withdraw based on an authorized investigation. His withdrawal and any related conflict was not the result of prosecutorial or governmental misconduct, but rather based upon a valid investigation into his potential involvement in a crime. Thus, we cannot conclude alleged governmental misconduct resulted in a violation of defendant's right to retained counsel of his choosing.

In support of his arguments, defendant relies upon *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, in which it was undisputed the prosecutor engaged in misconduct "when he provided defense counsel with a fraudulent transcript of defendant's police interrogation while the plea bargaining process was ongoing." (*Id*. at p. 448.) In response to the misconduct, the defendant's counsel filed a motion to dismiss "and he and [the] defendant waived the attorney-client privilege so they could testify at the evidentiary hearing." (*Ibid*.) Based on the waiver and the People's unsubstantiated claim defense counsel had privately admitted the defendant did not have a viable defense, the public defender's office removed defendant's counsel. (*Ibid*.) On that record, the court concluded it was "abundantly clear" prosecutorial misconduct led to the defendant losing his attorney as his trial counsel. (*Ibid.* ["There is simply no realistic difference between government action that improperly removes a defendant's counsel directly and government misconduct that necessarily leads to a defendant's counsel being forced to

40.

withdraw.  In both scenarios government misconduct leads to the loss of a defendant's original counsel, and in both scenarios the defendant's right to counsel had been prejudiced"].)

However, here, unlike in *People v. Velasco-Palacios*, the government did not falsify evidence or engage in egregious conduct that caused Carson to withdraw.  To the contrary, it is undisputed any interception in Carson's communications was pursuant to a judicially authorized warrant.  And the government did not take part in misconduct by engaging in a valid investigation into a crime.  Thus, while defendant characterizes the situation as a "government-created conflict," this was not a situation as in *People v. Velasco-Palacios* where the government manufactured grounds that ultimately led to the defendant losing his counsel.  Rather, counsel withdrew after he believed he could not ethically proceed in light of the sanctioned investigation.

### 2.    *Alleged Governmental Misconduct Did Not Result in Violation of Defendant's Due Process Rights*

Defendant also asserts "this is one of the few cases where the government's egregious misconduct violated [his] Fifth Amendment right to due process."  We disagree.

We cannot conclude the interceptions violated defendant's due process right to a fair trial under the Fifth Amendment to the federal Constitution.

> "The determination of whether the government engaged in outrageous conduct in violation of defendant's due process rights is a mixed question. The first step involves the consideration and weighing of the evidence and assessing the credibility of the witnesses to determine factually whether, and to what extent, governmental misconduct occurred.  This factual determination is clearly one that is subject to a deferential standard of review.  But the second step—whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating defendant's due process rights—involves the application of law to the established facts and is primarily a legal question.  The rights of the respective parties here are extremely important ones, namely, defendant's right to a fair trial and the People's right to prosecute persons believed to be

responsible for the commission of serious crimes." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857–858.)

Accordingly, the *Uribe* court held, a "trial court's finding that the governmental conduct was outrageous in violation of defendant's due process rights thereby warranting dismissal is subject to independent review." (*Id*. at p. 858.)

Here, as in *Alexander*, "there has been no showing that (1) the purpose of intercepting the [communications] was to discover defense strategy, (2) information in [them] was communicated to the prosecutor[], or (3) law enforcement agents utilized, or even could have utilized, information conveyed in the [communications]." (*People v. Alexander*, *supra*, 49 Cal.4th at pp. 891–892.) Furthermore, we also cannot conclude the challenged actions here were "so egregious as to shock the conscience" as to render the conduct arbitrary and violative of defendant's substantive due process rights. (*Id*. at p. 892 ["Arbitrary official action can violate a defendant's substantive due process rights, but 'only the most egregious official conduct can be said to be "arbitrary in the constitutional sense"'"]; accord, *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 846.) Here, as in *Alexander*, the interception occurred "pursuant to a judicially approved warrant," and no evidence suggests law enforcement exploited any information gained by sharing it with the prosecutor or utilizing it in another way to benefit the prosecution's case. (See *Alexander*, *supra*, at p. 892.) Indeed, there was no evidence any information germane to defendant's case was even intercepted. Thus, we conclude defendant's due process rights were not violated.

### 3. *Defendant Has Not Shown He Was Prejudiced By Any Alleged Conflict of Interest*

Defendant also argues the court failed to make a proper inquiry into the issue of conflict of interest and reversal is required based upon Carson's conflict. He contends the court knew Carson was under investigation in August 2012 and "it had an affirmative duty to make inquiry and take action to protect [defendant]'s right to unconflicted counsel," but the "court made no inquiries and did ***nothing***." Specifically, the court

42.

never informed defendant of a potential conflict of interest nor secured a conflict waiver from him. Additionally, the court erred by "reappointing Carson after he was acquitted of capital murder charges, but while he was still facing trial on perjury charges and thus still had a conflict of interest." We are not persuaded.

> """"The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest."" [Citations.] While the classic example of a conflict in criminal litigation is a lawyer's dual representation of codefendants, the constitutional principle is not narrowly confined to instances of this type. [Citation.] A conflict may also arise when an attorney's loyalty to, or efforts on behalf of, a client are threatened by the attorney's own interests. [Citation.] [¶] Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. [Citation.] This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."' [Citations.] An actual conflict of interest means 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citation.] Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309–310.)

"When a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [citation]." (*People v. Jones* (1991) 53 Cal.3d 1115, 1136.) "If the court determines that a waiver of a conflict of interest by the defendant is called for, it must assure itself that '"(1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right."

43.

[Citations.]' [Citation.] A trial court's failure to inquire into the possibility of a conflict of interest or to adequately respond to its inquiry is reversible error only if the defendant shows 'that an actual conflict of interest existed and that that conflict adversely affected counsel's performance.'" (*Id.* at pp. 1136–1137.) "'To determine whether counsel's performance was "adversely affected" … requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are … bound by the record. But where a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citations.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1001; accord, *People v. Holmes*, *McClain and Newborn* (2022) 12 Cal.5th 719, 753 ["An adverse impact on performance is shown by demonstrating counsel did or did not do something he otherwise might have done absent the conflict"].)

Here, we cannot conclude Carson's performance was adversely affected by any potential conflict of interest as to require reversal on this basis. That is, defendant fails to show Carson "pulled his punches" based on his alleged fear of prosecution. Though Carson stated in his declaration he "was fearful that questions [he] was asked at trial might be perceived as having an ulterior purpose for [his] own benefit in the case for which [he] was personally suspect," and he "regret[ted] [his] failure," neither he nor defendant identified any specific questions he failed to ask or any specific way in which any alleged conflict actually affected his performance. (See *People v. O'Malley*, *supra*, 62 Cal.4th at p. 1002 ["Defendant relies on defense counsel's statement during the in camera hearings expressing doubt about his own ability to continue with the case, but he identifies no instance in which the alleged conflict actually affected counsel's

44.

performance"]; *People v. Holmes*, *McClain and Newborn*, *supra*, 12 Cal.5th at p. 753 [rejecting claim right to counsel was impaired by attorney conflict where defendant "fail[ed] to show the existence of any actual impact on his counsel's performance"].) Nor does the record reveal any argument or actions conflict-free counsel likely would have made or undertaken but were not made or undertaken by Carson. To the contrary, the record reflects Carson vigorously represented defendant, extensively cross-examining and presenting witnesses, and repeatedly arguing motions and objections throughout trial. To the extent defendant asserts the court erred in reappointing Carson, defendant's own declaration reflects he was aware of the potential conflict with Carson and he never voiced an objection to his ultimate representation at sentencing.

And defendant has not shown a reasonable probability the result of the proceeding would have been different but for any alleged deficiencies in Carson's performance. (See *People v. Holmes*, *McClain and Newborn*, *supra*, 12 Cal.5th at p. 753 ["To obtain relief for ineffective assistance of counsel, a defendant must show both deficient performance 'and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different'"].) As discussed, the record reflects Carson was a zealous advocate for defendant throughout the trial. And the jury convicted all of the defendants of the murders and attempted murders of Diaz, Ochoa, W.H., and Officer Meyer as well as the substantive gang offense. From these verdicts, it is clear the jury rejected defendant's theory of self-defense. And we cannot conclude any alleged deficiency in Carson's performance affected the verdict.

For all these reasons, we reject defendant's first contention.

## II.    Sufficient Evidence Supports Attempted Premeditated Murder Convictions

Defendant next argues the evidence was insufficient to support his attempted murder convictions as to Officer Larry Meyer (count III) and W.H. (count V).

## A. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence is "'"'"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"'"'" (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)  The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (See *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence."'" (*People v. Navarro*, *supra*, 12 Cal.5th at p. 302.)

It is the jury, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt.  (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.)  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  (*Ibid.*)

## B. Applicable Law

The elements of attempted murder are the specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)  "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."'  [Citation.]  '[T]o be guilty of attempted murder as an aider and abettor, a

person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) Intent to kill may "be inferred from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.'" (*Ibid.*)

"'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.… [¶] … [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen supra*, 61 Cal.4th at p. 1054.)

### C. Analysis

Defendant contends he was convicted as an aider and abettor of the attempted premeditated murder charges. But, he argues, the evidence was insufficient to establish he intended to kill Officer Meyer or that he aided or assisted in attempting to kill Meyer. He asserts "the bullet was neither fired close to Meyer[] or in a manner that would have inflicted a mortal wound." He also contends there was no evidence he knew "of a plan to kill Meyer[], formed the intent to assist in killing Meyer[], and then contributed to the killing by act or advice."

Reviewing the evidence in the light most favorable to the judgment, we conclude sufficient evidence supports defendant's conviction of attempted premeditated murder of Officer Meyer (count III). That is, a reasonable factfinder could infer from the facts defendant aided and abetted in the premeditated attempted murder of Officer Meyer. Here, Officer Meyer testified he saw a gun come out of the right passenger side of the

truck and then he saw muzzle flashes and heard shots fired in his direction. As a result, he backed off momentarily. It is undisputed defendant was the front right passenger of the fleeing truck; thus, there was no question defendant was present at the scene when the shooting occurred. And there was evidence from which a reasonable factfinder could conclude defendant shared the shooter's mens rea at the time of the offense. That is, defendant himself testified he was "trying to help" Arguello out during the police chase by directing Arguello while he was driving, evincing defendant's motivation to evade law enforcement. Defendant was acquainted with Zapien and Ferrel, the backseat passengers, before the incident and knew them as fellow Norteño gang members. And defendant was necessarily aware of the shooter's willingness to use lethal force based on the deadly shooting precipitating their flight; in fact, defendant had demonstrated his own willingness to use lethal force. When the truck stopped, instead of disassociating from the shooter, defendant fled the scene with the other two passengers, including the person who shot at Meyer. (See *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1054 [factfinder can consider presence at scene of crime, companionship, and conduct before and after the offense in considering whether actions amounted to aiding and abetting].) A jury could reasonably infer from such evidence defendant had a strong motive to promote, encourage, or instigate the attempt to kill the pursuing officer in furtherance of his attempt to evade police, and he did in fact aid and abet a premeditated attempt to kill Officer Meyer. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 741 ["evidence of motive is often probative of intent to kill"].)

In reaching our conclusion, we find instructive *People v. Nguyen*, *supra*, 61 Cal.4th 1015. In *Nguyen*, the front seat passenger of a car, in which the defendant was the back passenger, fired multiple shots into a car next to it at a traffic signal. (*Id*. at p. 1027.) Specifically, the evidence introduced at trial reflected the car in which the defendant was a passenger passed the victim's car—the occupants of which were rival gang members—the defendant stared back at the occupants of the victim's car as the cars

passed each other; the car in which the defendant was an occupant idled in a parking lot until the victim's car passed and then it followed the car several blocks until pulling up next to it at a stop light where the front passenger shot into the victim's car. (*Id*. at p. 1053.) The victim, the driver of the other car, was shot in the neck. (*Ibid*.) Several days after the shooting, the defendant visited a person who had been an occupant in the victim's car and asked, "What's up with the cops?" (*Id*. at p. 1054.) The *Nguyen* court held, considering this evidence in the context of the ongoing gang war between the defendant's gang and the victim's gang "as well as the Asian gang practices" described by the gang expert, the jury could have inferred the defendant knew of the shooter's intent to kill, shared that intent, and aided him by spotting potential targets. (*Id*. at p. 1055.) The court noted, "Although 'gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime,'" the gang expert's testimony "strengthened inferences arising from other evidence specific to defendant's role in the crime at issue." (*Ibid*.)

As in *Nguyen*, the sufficiency of the evidence issue regarding Officer Meyer is close. (*People v. Nguyen*, *supra*, 61 Cal.4th at p. 1056.) However, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Viewing the record in the light most favorable to the judgment and considering the factors of presence, companionship, and conduct before, during, and after the commission of the attempted murder of Officer Meyer, we conclude the evidence permits a reasonable inference of guilt as an aider and abettor.

The evidence in support of defendant's conviction for premeditated attempted murder of W.H. is stronger. Here, the evidence reflected defendant and Arguello had an initial interaction with the individuals at Maxine Drive before defendant called Zapien and Ferrel, fellow Norteño gang members. After picking up Zapien and Ferrel, the group returned to the scene because, by his own admission, defendant wanted to fight. Though

49.

defendant denied knowledge Zapien or Ferrel had a gun, he admitted it was common for gang members to be armed. Defendant, Zapien and Ferrel were all armed with guns and there was evidence from which the jury could conclude they planned which individual would target each victim—Ochoa, Diaz, or W.H.—based upon the evidence they split up and each approached a target individual when they got out of the truck. There was also evidence from which the jury could conclude Zapien held a gun to W.H.'s face, but W.H. managed to push him away and then one of the individuals fired at W.H. while W.H. ran away. A jury could reasonably infer from such evidence the shooter harbored an intent to kill and took a "direct but ineffectual act" to accomplish the killing. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 53 [evidence shooter pointed gun at victim's face and then fired multiple shots as victim fled supported inference of intent to kill]; accord, *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 ["'The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill'"].) From such evidence, the jury could also reasonably infer defendant knew of his coperpetrator's intent to kill W.H.; he intended to encourage or facilitate the commission of the offense, and, in fact, aided, promoted, encouraged or instigated the commission of the crime. (See *People v. Pettie*, *supra*, at p. 53 [jury could reasonably infer assault was planned in advance and, by participating in assault on victim, defendant encouraged coperpetrator to fire gunshots with the intent to facilitate his commission of attempted murder].) Thus, substantial evidence supports defendant's conviction in count V.

We also conclude the evidence was sufficient to establish both attempted murders were deliberate and premeditated. "To begin with, as a substantive matter section 664[, subdivision ](a) requires only that the *murder attempted* was willful, deliberate, and premeditated for an attempted murderer to be punished with life imprisonment." (*People v. Lee* (2003) 31 Cal.4th 613, 621–622.) "Thus, section 664(a) states *only* that the murder attempted must have been willful, deliberate, and premeditated, *not* that the attempted

murderer *personally* must have acted willfully and with deliberation and premeditation. Put otherwise, section 664(a) states that if the murder attempted was willful, deliberate, and premeditated, any 'person *guilty of that attempt*'—*not* confined to persons *who acted willfully and with deliberation and premeditation*—'shall be punished by imprisonment … for life.'" (*Id.* at p. 622.) And, in assessing the evidence for premeditation and deliberation, "'The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[d] an intent to kill, is not such deliberation and premeditation ….'" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) "In this context, '"premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action."' [Citation.] We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 645.)

Here, much of the evidence of premeditation and deliberation as to the attempted murders of W.H. and Officer Meyer is the same as that showing an intent to kill. First, with regard to W.H., there was evidence defendant had an initial altercation with Diaz and Ochoa during which W.H. was present. Defendant threatened to return. He went with Arguello to pick up Ferrel and Zapien—fellow gang members who were armed— and then returned to the scene. From such evidence, a rational trier of fact could conclude the initial confrontation provided a motive for defendant and his fellow gang members to return and kill the group after he was disrespected. (See *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 ["the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation]

51.

or any motive, 'shallow and distorted but, to the perpetrator genuine' may be sufficient"];
*People v. Anderson* (1968) 70 Cal.2d 15, 27 [facts about defendant's prior conduct or relationship with victim from which jury could reasonably infer "motive" to kill victim support finding of premeditation and deliberation].) And his return to the scene with armed confederates also evinces planning activity. (See generally *People v. Potts* (2019) 6 Cal.5th 1012, 1027 [evidence defendant arrived at victims' home carrying a weapon suggests murders were planned].) There was also evidence that when they arrived at Diaz's residence, defendant went toward Ochoa; Zapien held W.H. at gunpoint; and Ferrel was looking for Diaz before the shooting began; and W.H. testified both Ferrel and Zapien wore masks, further evincing planning activity. A reasonable factfinder could construe all of this conduct leading up to the shooting as planning activity. Viewing such evidence in the light most favorable to the verdict coupled with the evidence of motive, we conclude sufficient evidence supports the jury's conclusion the attempted murder of W.H. was deliberate and premeditated. Indeed, there was evidence defendant himself had an opportunity to reflect on and consider the group's collective actions and he shared the intent to kill.

We also conclude sufficient evidence supports the jury's conclusion the attempted murder of Officer Meyer was deliberate and premeditated. After Officer Meyer began pursuing the red truck and before the shots were fired in his direction, plenty of time elapsed to permit the shooter to consider his actions. In addition, the evidence supported a jury finding the shooter had to position himself so he could shoot backwards out of the window, and he fired multiple shots in Officer Meyer's direction. In turn, this supported a conclusion the attempted murder was not done rashly but rather was deliberate and premeditated. (See *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 [manner of killing, three quick shots from a relatively close range, supported finding of premeditation and deliberation].) And the evidence established every defendant had a motive to kill Officer Meyer: to facilitate their escape. Viewing such evidence in the

52.

light most favorable to the judgment, a rational trier of fact could conclude the attempted murder of Officer Meyer was deliberate and premeditated. (See *People v. Nguyen*, *supra*, 61 Cal.4th at pp. 1055–1056.)

We reject defendant's second contention.

## III. CALCRIM No. 3472

Defendant next challenges the inclusion of CALCRIM No. 3472 in the jury instructions. We reject defendant's contention.

### A. Relevant Factual Background

Without referencing any specific instruction, the prosecutor argued in closing that self-defense is a perfect defense, but:

> "[i]t's not available to those who seek to quarrel with the intent to create or excuse to use force [*sic*]. It's not available to those who seek to quarrel. It's not available to those who intend to create an excuse to use force. They were seeking a quorum [*sic*]. There was no other reason to go to [Diaz]'s house. They were going to a party, remember? It was … Ferrel's birthday. The only, only reason to go to [Diaz]'s house was to take care of business, was to kill [Diaz] and [Ochoa] for disrespecting [defendant] because they were not going to put up with that.
>
> "They can stand up here and tell you how drunk they were but, boy, they have no problem telling you how they got there, who picked them up, where they were seated in the truck, how they carried their guns, who had what gun, who was there. Does that sound like people who are drunk to you? So drunk that they can't form the intent to kill. Does that sound like people who are just there to, as [defendant] says, smooth things over? No. You don't carry a .40-caliber semiautomatic with an extended clip with multiple rounds in it. They're seeking a quarrel. They went there looking for a fight armed with loaded firearms. Not available to them."

Here, the jury was instructed on perfect and imperfect self-defense and defense of another regarding the murder and attempted murder charges and their lesser included offenses.

The trial court also instructed the jury pursuant to CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived): "A person does not have the right to self-defense

if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Defense counsel did not object to the inclusion of this instruction.

## B. Standard of Review

Claims of instructional error are reviewed de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*Ibid.*)

Heightened scrutiny is applied when evaluating errors that infringe upon a party's due process rights, e.g., the use of jury instructions that relieve the prosecution of its burden to prove each element of the charged offense beyond a reasonable doubt. (See *People Schuller* (2023) 15 Cal.5th 237, 243, 251.) Such errors are considered prejudicial unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## C. Analysis

Defendant contends the inclusion of CALCRIM No. 3472 diminished his plea of self-defense and relieved the prosecution of its burden to affirmatively disprove self-defense beyond a reasonable doubt in order to prove the malice element of murder. Initially, he asserts the evidence did not establish he provoked a fight with the intent to create an excuse to use deadly force; rather, he contends, W.H.'s testimony established Diaz and Ochoa started the argument and defendant "merely responded to the quarrel

54.

Diaz and Ochoa started." He further argues, even though he returned for a fistfight, he was not stripped of his right to self-defense if he reasonably or unreasonably believed in the need to defend himself from an imminent threat of sustaining great bodily injury or death. He contends, however, that CALCRIM No. 3472 erroneously led jurors to believe that because defendant was involved in a prior argument, he forfeited his right to self-defense when he returned. He argues the prosecutor's argument "'compounded the error'" by telling the jury self-defense "'would not work'" because "'[i]t's not available to those who seek to quarrel with the intent to create [an] excuse to use force.'" He argues the instruction deprived him of his rights to due process, a fair trial, and reliable jury verdicts and should be assessed for prejudice as constitutional error under the *Chapman* standard. He argues his convictions on counts 1 and 2 should be reversed on this basis. The People respond defendant forfeited his claim by failing to object below. Irrespective, the evidence justified the instruction and, even if it was given in error, a result more favorable to defendant was not reasonably probable.

While state law claims asserting error in jury instructions may be forfeited, "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579.) Here, defendant claims the allegedly flawed instruction deprived him of due process, which would affect his substantial rights if true, so his claim is not forfeited. (See *ibid*.) However, we reject defendant's claim on its merits.

Initially, we note CALCRIM No. 3472 is generally a correct statement of law. (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 761–762 [holding self-defense and imperfect self-defense "'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified'"].) And we disagree with

defendant's claim the challenged instruction, in context, was erroneous and misled the jury.

Defendant relies upon an opinion of a divided panel of Division Three of the Fourth District Court of Appeal, *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*) and *People v. Conkling* (1896) 111 Cal. 626 (*Conkling*) in support of his argument. In *Ramirez*, the defendant argued CALCRIM No. 3472 erroneously "made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Ramirez. supra*, at p. 945.) And the prosecutor exacerbated the error by arguing "repeatedly based on the plain terms of this instruction that even if the jury believed defendants sought to provoke only a fistfight, their bare intent 'to use force' as stated in the instruction—even nondeadly fisticuffs—meant they forfeited a claim of imperfect self-defense." (*Id.* at p. 943.) The prosecutor also forcefully argued "it [did not] matter" whether the decedent was actually armed or defendant believed he or his companions were about to be shot, thereby misleading the jury on the law of self-defense. (*Id.* at p. 952.) The *Ramirez* majority held "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances," but, in the circumstances of that case, it "did not accurately state governing law." (*Ramirez*, at p. 947.) Specifically, the "blanket rule" provided in the instruction and reiterated by the prosecutor effectively told the jury "that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ibid.*) Additionally, the *Ramirez* court also instructed the jury with a modified version of the standard imperfect self-defense instruction (CALCRIM No. 571) that told the jury: "'The principle of imperfect self-defense may not be invoked by a defendant who, through his own wrongful conduct (e.g., the invitation of a physical assault or the commission of a felony) has created circumstances under which his adversary's attack or pursuit is legally justified,'" which did nothing to counteract CALCRIM No. 3472's categorical terms or the prosecutor's argument. (*Ramirez*, at p. 952.) The *Ramirez* court concluded the defendant was prejudiced because the court

56.

effectively endorsed the prosecutor's misstatement of law by failing to modify the language of CALCRIM No. 3472 and erroneously foreclosed the defendants' imperfect self-defense claim. (*Ramirez*, at pp. 952–953.)

Unlike the prosecutor in *Ramirez* who repeatedly insisted it did not matter if the original victim escalated a nondeadly conflict to a deadly one, here, the prosecutor referred to the general principle stated in CALCRIM No. 3472 in passing as part of her argument the defendants went to Diaz's house with firearms with the intent to kill. Thus, her reference to the instruction in context was not a misstatement of the law. And, unlike in *Ramirez*, she never suggested the language of the instruction meant the defendants did not have the right to respond to a deadly attack, and neither side encouraged the jury to misapply the instruction. Rather, the prosecutor told the jury if it believed the defendants acted in self-defense, it should acquit them. She argued, however, the evidence did not support a claim of self-defense, asserting defendant's and Ferrel's versions of events were false. She highlighted, in part, evidence Diaz had gunshot entrance wounds on his back, the downward trajectory of the bullet in Ochoa's body suggested the shooter was standing above him, and the defendants fled the scene and never mentioned in their jail calls after the incident that they acted in self-defense. Notably, the jury here was also not instructed with a modified version of CALCRIM No. 571 as in *Ramirez*.

*Conkling*, *supra*, 111 Cal. 616, which defendant also cites in support of his argument, also does not persuade us otherwise. In *Conkling*, the defendant was charged with the murder of a neighbor with whom he had an ongoing dispute regarding access to a road. (*Id.* at p. 620.) At trial, the defendant argued self-defense. (*Id.* at p. 621.) The jury was instructed that killing someone for obstructing a road is not justified, and if it believed the defendant killed the victim, "then, to render such killing justifiable, it must appear that the defendant was wholly without any fault imputable to him by law in bringing about the commencement of the difficulty in which the mortal wound was given." (*Id.* at p. 624.) The jury was further instructed "'an honest apprehension of

57.

danger to life or limb'" justifies taking a life only if the "'apprehension [arose] out of a reasonable cause, but a cause originating in the fault of the person himself, in a quarrel he provoked, or in a danger he voluntarily brought upon himself by his own misconduct, could not be considered "reasonable or sufficient in law to support a well-grounded apprehension of imminent danger to his person." (*Id.* at pp. 624–625.) The jury was also instructed "a real or apparent necessity, brought about by the design, contrivance, or fault of the defendant, cannot be availed of as a defense for the commission of a crime or a homicide." (*Id.* at p. 625.) In concluding these instructions violated the defendant's rights, the California Supreme Court found there was no evidence the defendant was the "first assailant, and then withdrew, or attempted in good faith to withdraw from the affray before he fired the fatal shot." (*Ibid.*) Thus, the evidence did not warrant the instructions "regardless of the soundness of the law covered by it." (*Ibid.*) The *Conkling* court concluded it could not "say that no injury resulted" because the jury could have interpreted the instructions to mean that if the defendant's attempt to travel the road was wrongful then he could not claim self-defense, which was not the law. (*Ibid.*)

First, the language of the instructions in *Conkling* was different from the standard language of CALCRIM No. 3472 given here. And, here, unlike in *Conkling*, there was evidence from which the jury could conclude defendant provoked a fight with Diaz and Ochoa during the initial confrontation and Ochoa and Diaz were ready to have a fistfight as a result. Then, defendant, armed with additional armed confederates, confronted Diaz and Ochoa with deadly force, and Ochoa pulled a gun out in response. Because the instruction here was supported by the evidence, *Conkling* is inapposite.

For the same reason, we further reject defendant's claim there was not substantial evidence to support the inclusion of CALCRIM No. 3472. Here, W.H. testified defendant was "acting hard" in the initial interaction with Diaz and Ochoa and he was asking Ochoa where he was from, if he banged, and questioned whether Ochoa was

58.

"active."[3]  There was also evidence defendant referred to Diaz's mother by the term "bitch," called Ochoa and Diaz "leyvas," and stated he and Arguello would return "pinta" style.  W.H. testified defendant's behavior angered Diaz and Ochoa to the point they were poised for a fistfight during the initial interaction.  And then defendant returned armed with two more gang members and the resulting shooting occurred.  The jury could reasonably conclude from the evidence defendant provoked the fight, and CALCRIM No. 3472 informed the jury the victims could respond to the attackers' deadly assault with a counterassault, and the attackers who provoked the fight could not assert self-defense against the victims' lawful resistance.  (See *Ramirez, supra*, 233 Cal.App.4th at p. 947; accord, *People v. Enraca, supra*, 53 Cal.4th at pp. 760–762.)

Irrespective, even assuming it was error to include the instruction because it was unsupported by the evidence, it was  """"only a technical error which does not constitute ground for reversal.""""  (*People v. Cross* (2008) 45 Cal.4th 58, 67.)  And, to the extent such an instruction was not applicable to the facts of the case, we presume the jury followed the instruction to disregard it.  Thus, we cannot conclude the inclusion of CALCRIM No. 3472 constituted reversible error.  (See *People v. Eulian, supra*, 247 Cal.App.4th at p. 1335 [if CALCRIM No. 3472 was erroneously given because it was irrelevant under the facts, error was merely technical and not grounds for reversal]; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 [jury was presumed to disregard CALCRIM No. 3472 if the jury found evidence did not support its application so its

---

[3]In his reply brief, defendant contends the cited behavior was insufficient to amount to provocation, citing *People v. Najera* (2006) 138 Cal.App.4th 212, 225.  However, *Najera* discussed provocation in the context of what amounts to sufficient provocation to meet the objective standard for voluntary manslaughter.  In that context, the *Najera* court held """"[a] provocation of slight and trifling character, such as words of reproach, however grievous they may be, … is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.""""  (*Najera*, at p. 226.)  Here, we are discussing provocation in the context of starting a fight or quarrel as opposed to considering whether the provocation was sufficient to establish a killing was done in the heat of passion; thus, *Najera* is inapposite.

erroneous inclusion did not result in reversible error]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381 [rejecting argument erroneous instruction on contrived self-defense kept jury from evaluating defendant's self-defense claim, concluding any error was harmless where jury was instructed to disregard inapplicable instructions].)

Furthermore, the prosecutor did not rely on CALCRIM No. 3472 to urge the jury to reject defendant's self-defense theory on an improper basis. And the California Supreme Court has held a jury's finding of premeditation and deliberation indicates "a complete rejection of the evidence on which defendant relied to establish self-defense." (*People v. Crandell* (1988) 46 Cal.3d 833, 874; see *id.* at p. 872 [finding no prejudice in the use of allegedly erroneous self-defense instructions, including an instruction on contrived self-defense], abrogated on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.) From this record, we conclude, beyond a reasonable doubt, the alleged instructional error did not contribute to the jury's verdicts.

We reject defendant's third contention.

## IV. Assembly Bill 333 Requires Reversal of Gang-related Firearm Enhancements and Count IX

Defendant next asserts his conviction for active participation in a criminal street gang in violation of section 186.22, subdivision (a)—count IX—and the gang-related firearm enhancements attached to counts I and II (§ 12022.53, subds. (d), (e)) and III and V (§ 12022.53, subds. (c), (e)) must be reversed based on changes made to section 186.22 by the enactment of Assembly Bill 333. We agree with defendant and conclude he is entitled to reversal of his conviction on count IX and the gang-related firearm enhancements.

### A. Statutory Changes to Section 186.22 and Enactment of Section 1109

While defendant's appeal was pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to impose

new substantive and procedural requirements for gang allegations. The legislation went into effect on January 1, 2022.

First, Assembly Bill 333 amended the definition of a "'criminal street gang,'" requiring proof the gang is an ongoing, *organized* association or group of three or more persons, whose members *collectively* engage in, or have engaged in, a pattern of criminal activity (§ 186.22, subd. (f), italics added). Next, the law created a stricter requirement for proof of "'a pattern of criminal gang activity,'" which is necessary to prove the group with which the defendant is associated is indeed a criminal street gang. (See § 186.22, subds. (e)–(f).) Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (See former § 186.22, subd. (e).) Under the newly amended law, the offense with which defendant is currently charged cannot be used as one of the two predicate offenses. (§ 186.22, subd. (e)(2).) In addition, the last of the predicate offenses must have "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) The predicate offenses must have been committed "on separate occasions or by two or more members," and must have been for the "common[] benefit[] [of] a criminal street gang," and "the common benefit from the offenses is more than reputational." (*Ibid.*) Assembly Bill 333 also narrowed the list of offenses that may be used to establish a pattern of criminal gang activity. (Compare former § 186.22, subd. (e)(1)–(33) with current § 186.22, subd. (e)(1)(A)–(Z)). Additionally, it defines "to benefit, promote, further, or assist" throughout section 186.22 to mean "to provide a common benefit to members of a gang where the common benefit is more than reputational." (*Id.*, subd. (g).) The legislation notes examples of nonreputational common benefits "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

61.

Finally, Assembly Bill 333 adds section 1109, which requires bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.) Section 1109 also requires the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) be tried separately from all other counts that do not require gang evidence as an element of the crime (§ 1109, subd. (b)).

B.      **Defendant Is Entitled to Reversal of His Gang-related Firearm Enhancements and Count IX**

In *People v. Tran* (2022) 13 Cal.5th 1169, the California Supreme Court held Assembly Bill 333's amendments to section 186.22 altering the substantive requirements necessary to prove the substantive gang offense and gang enhancements operate retroactively under the rule of *In re Estrada* (1965) 63 Cal.2d 740.  (*Tran*, at p. 1207.) The *Tran* court explained,

> "*Estrada* 'stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date.' [Citation.]  *Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' [Citation.]  Here, 'Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22— for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang….' [Citations.]  These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran.  [Citation.]'" (*People v. Tran*, *supra*, at pp. 1206– 1207.)

Accordingly, it is undisputed defendant may seek the benefit of Assembly Bill 333's amendments to section 186.22.

Defendant argues the predicate offense involving Christopher Colon "appears to have been committed by him alone," so it can no longer be a predicate offense because it was not committed by two or more "members" of the gang (as opposed to any persons) or serve as evidence of a pattern of criminal gang activity. He also argues there was no evidence the predicate offenses "commonly benefited a criminal street gang" and "the common benefit of the offense [must be] more than reputational." He further contends the People's gang expert used the current offense as well as evidence of two predicate offenses involving Colon and Esteban Zapien to establish the pattern of gang activity, but the current offense can no longer be used to establish a pattern of gang activity. The People agree the gang allegations need to be reversed because the jury's findings "do not comply with the new statutory terms."

Initially, we agree defendant is entitled to reversal of his conviction for active participation in a criminal street gang (count IX). "The essential elements for a conviction under section 186.22[, subdivision] (a) are: '(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Valenzuela* (2019) 7 Cal.5th 415, 422.) And, as the parties do not dispute, the evidence presented at trial is now insufficient to establish "'a pattern of criminal gang activity'" and, thus, a "'criminal street gang'" as necessary to sustain defendant's substantive gang conviction and enhancements pursuant to amended section 186.22. (§ 186.22, subds. (e), (f).) The predicate offense evidence was insufficient to comply with the amended law. There was no evidence either predicate offense commonly benefitted a criminal street gang, and the common benefit was more than reputational as necessary to establish a "'pattern of criminal gang activity'" under the amended law. (§ 186.22, subd. (e)(1); see *People v. Lopez* (2021) 73 Cal.App.5th 327, 346 ["Although the People did submit evidence of two

predicate offenses that were committed in the new time frame, the People did not prove that the predicate offenses commonly benefitted a criminal street gang and that the benefit was more than reputational"].)

Additionally, we also agree the gang-related firearm enhancements (§ 12022.53, subds. (c), (e)/(d), (e)) must be reversed. These enhancements require a finding "the person violated subdivision (b) of section 186.22." (§ 12022.53, subd. (e)(1)(A).) As we have already concluded, the evidence presented at trial was insufficient to meet the current requirements. Thus, we also reverse defendant's gang-related firearm enhancements to counts I, II, III, and V. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346 ["Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22"]; accord, *People v. Lopez* (2022) 82 Cal.App.5th 1, 7, 25 [holding Assem. Bill 333's amendments to § 186.22, subds. (e) & (f) lawfully apply to § 182.5, which incorporates those sections]; *People v. Lee* (2022) 81 Cal.App.5th 232, 240 ["The express reliance by … the firearm enhancement statutes … on the definition of a criminal street gang in section 186.22 means that appellants are entitled to the benefit of this change in the law as to" those enhancements and special circumstance allegations], review granted Oct. 19, 2022, S275449.)

## C.    Prosecution May Retry Count IX and the Gang-related Firearm Enhancements

The parties agree, as do we, the People may retry defendant on the substantive gang offense (§ 186.22, subd. (a), count IX). "'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.'" (*People v. Sek* (2022) 74 Cal.App.5th 657, 669; accord, *People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 ["Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper

and the reviewing court does not treat the issue as one of sufficiency of the evidence"]; see *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand"].)

Defendant, however, contends the People should be prohibited from retrying the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II and the section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V because the jury found the gang enhancements (§ 186.22, subd. (b)) on each of these counts not true. He acknowledges that inconsistent verdicts or findings are allowed to stand but asserts, "[A]llowing the People to retry the gang enhancement[s], giv[es] the People a second bite at the apple after they did not prove the gang allegations beyond a reasonable doubt under the old, less restrictive elements, would violate the double jeopardy clauses of the state and federal constitution[s]." He asserts, in *People v. Santamaria* (1994) 8 Cal.4th 903, 910 the California Supreme Court held a "not true" finding on an enhancement allegation precludes retrial of that allegation. Accordingly, he argues, because he cannot be retried on the section 186.22, subdivision (b) enhancements that the jury found "not true," he cannot be retried on the gang-related firearm enhancements that require retrying of the gang enhancements. Thus, he asserts, the gang-related firearm enhancements must be reversed and dismissed. He further contends retrial is also prohibited by the rule articulated in *People v. Henderson* (1963) 60 Cal.2d 482 that the double jeopardy clause of the United States Constitution precludes imposition of a more severe punishment on resentencing when a defendant successfully appeals a criminal conviction.

As both parties agree, the jury's "not true" findings as to the section 186.22, subdivision (b) enhancements and the jury's true findings as to the gang-related firearm enhancements were necessarily inconsistent. And it is settled "an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is

inconsistent with a conviction of the substantive offense, effect is given to both." (*People v. Santamaria*, *supra*, 8 Cal.4th at p. 911; accord, *People v. Avila* (2006) 38 Cal.4th 491, 600; *People v. Palmer* (2001) 24 Cal.4th 856, 860.) "'[A]n inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 513; see *People v. Lewis* (2001) 25 Cal.4th 610, 656.)

Considering these established principles, defendant's proposed remedy cannot stand. To hold the People are not allowed to retry the gang-related firearm enhancements because of the "not true" finding as to the section 186.22, subdivision (b) enhancement allegations would not "give effect" to the jury's "true" finding as to the section 12022.53, subdivisions (d), (e) and (c), (e) enhancements, but rather only give effect to the jury's findings as to the section 186.22, subdivision (b) findings.

Indeed, our highest court affirmed this conclusion in *Bravo-Fernandez v. United States* (2016) 580 U.S. 5 in which it held the double jeopardy clause does not bar retrial based on issue preclusion when a jury returns irreconcilably inconsistent verdicts of conviction and acquittal, and the convictions are later vacated for legal error unrelated to the inconsistency. (*Id.* at pp. 17–18.) The *Bravo-Fernandez* court explained, the defendant bears the burden of demonstrating the jury necessarily resolved the issue seeking to be precluded in his favor; but he "cannot meet that burden where the trial yielded incompatible jury verdicts on the issue the defendant seeks to insulate from relitigation." (*Id.* at p. 19.) This is because "[i]t is unknowable 'which of the inconsistent verdicts—the acquittal[s] or the conviction[s]— "the jury really meant."' [Citations.]" (*Ibid.*) Said differently, "[t]he convictions' later invalidation on an unrelated ground does not erase or reconcile that inconsistency: It does not bear on 'the factual determinations actually and necessarily made by the jury,' nor does it 'serv[e] to turn the jury's otherwise inconsistent and irrational verdict into a consistent and rational verdict.'" (*Id.* at p. 21; see *United States v. Powell* (1984) 469 U.S. 57, 69 ["Respondent is given the

benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted"].)

Accordingly, we conclude retrial of the gang-related firearm enhancements is not prohibited by the jury's "not true" findings as to the section 186.22, subdivision (b) enhancement allegations. Rather, because we do not reverse the section 12022.53 subdivisions (d), (e) and (c), (e) enhancements for insufficient evidence, the People may retry them on remand.

*People v. Henderson*, *supra*, 60 Cal.2d 482 does not persuade us otherwise. The *Henderson* court held the prohibition against double jeopardy precludes imposition of the death sentence after reversal of a judgment sentencing the defendant to life imprisonment. (*Id*. at pp. 495–497.) Our conclusion does not permit the People to seek a greater punishment on remand. Rather, they may only retry the section 12022.53 allegations and the section 186.22, subdivision (a) count, of which defendant was already convicted, and only an equal or lesser sentence may result.

## V. Prosecutor Did Not Engage in Prejudicial Misconduct

Defendant next argues the prosecutor's misconduct rendered his trial fundamentally unfair, denying him due process mandating reversal of his convictions. He asserts the prosecutor intentionally elicited prejudicial evidence, which disparaged the defense and suggested the prosecution had evidence outside the record.

### A. Relevant Background

Throughout the trial, there was a significant amount of argument regarding whether the prosecutor's office should be required to disclose W.H.'s address to the defense attorneys since W.H. was in the state witness protection program. Initially, the court ordered the prosecution to disclose W.H.'s address and then excluded W.H.'s testimony as a sanction for the prosecution's failure to provide the defense with the

address.  However, after the People filed a writ of mandamus and petition for review related to the order, the court reconsidered its order and permitted W.H. to testify without requiring the prosecution to disclose his address.

There was also extensive testimony at trial regarding money paid to W.H. by the California Witness Relocation Assistance Program.  Initially, W.H. received $3,800, but during trial he was given additional money to relocate again.  During cross-examination the following exchange took place between defendant's counsel and Detective Hicks about additional payments to W.H.:

> "Q.  Well—well, how is it conveyed about how much money is supposed to be paid to the Government witness?
>
> "A.  Those determinations were made months ago.  He hasn't received any of the money.
>
> "Q.  Well, wait a minute.  He's received more than $3,800?
>
> "A.  Correct.
>
> "Q.  All right.  So all that money, now—I mean, you're saying that whenever there is—this jury was being told that the totality of what he was supposed to be paid was $3,800; you acknowledge today that that was never the case, don't you?
>
> "A.  That's not correct."

On continued cross-examination, Zapien's counsel also questioned Hicks about payments to W.H.:

> "Q.  Detective Hicks, regarding this money issue that [defendant's counsel] raised giving [W.H.] money, you said he's been given money a couple of times?  Do I remember that correctly?
>
> "A.  Yeah.  Yes, sir.
>
> "Q.  And how many times have you facilitated providing money to [W.H.]?
>
> "A.  Twice.

68.

"Q. So [W.H.] has—the first time had been given a check for $3800; correct?

"A. Yes.

"Q. All right. And then there was a need to give [W.H.] additional money; is that correct?

"A. Yes.

"Q. The second time?

"A. Yes, sir."

Hicks confirmed funds had been expended three times for W.H.'s benefit. Zapien's counsel then questioned Hicks about the amount of the additional payments and Hicks responded he did not know the exact amount but provided estimates. Then, Arguello's counsel questioned the reason for the additional funds:

"Q. The reason he wanted the money was to move someplace where nobody would be able to find him?

"A. No.

"Q. Was the reason he wanted the money was to help with moving expenses he'd incur ordinarily?

"A. He wanted the monies to move so he could be safe."

During redirect examination, the prosecutor asked Detective Hicks why he requested to move W.H. after W.H. testified, and Detective Hicks explained W.H.'s address had been compromised. The prosecutor asked, "By whom?" and Detective Hicks responded, "Defense attorneys." No objections were lodged to the prosecutor's question or to Hicks's response by any of the defense attorneys.

On recross-examination, the following exchange then took place between defendant's counsel and Hicks:

"Q. Well, whenever—in terms of [W.H.]'s address being compromised, you were aware that the—some members of the defense was [*sic*] trying to serve his girlfriend; right?

69.

"A. Yes.

"Q. All right. And so—and then—and you're aware as well that the defense was authorized by the Court to do that; isn't that true?

"A. I don't think that's true."

Hicks later confirmed he was not aware of a court order prohibiting defense counsel from trying to serve W.H.'s girlfriend. In response to questioning by Arguello's counsel on additional recross-examination, Hicks testified an agent of the defense team, an investigator, learned of W.H.'s address and there was an individual searching the area. He also affirmed the defense investigator was under court order not to disclose the address to anybody outside of the defense investigative team. The prosecutor objected and the court sustained objections to Arguello's counsel's questions to Hicks regarding whether counsel would lose his bar card if he disclosed W.H.'s address. At one point Arguello's counsel asked Hicks: "And as a result of [W.H.] being moved, the defense was no longer able to surveil this person; am I right? Because you whisked him out of there before the defense had any chance to pursue a defense investigation, such as following [W.H.] around to see if he hangs around with gangster homies?" At that point, the prosecutor asked for a sidebar, and the court agreed the question was "inappropriate." As counsel started having a back and forth, the court ordered a recess. Then, the following exchange occurred outside the presence of the jury:

> "THE COURT: I don't mind you asking questions to—obviously, if there's been an insinuation that the defense had either done something wrong, I don't mind you following up with that. But clearly a lot of that is not—it's outside the scope for the trial.

> "[ARGUELLO'S COUNSEL]: The problem I had, Your Honor, was that the witness had said on the one hand that the reason to spend all these tax dollars was that [W.H.] was in fear of his safety and that he was being moved to protect him from physical harm, which is quite reasonable, but then we're also told that he was moved simply because the defense team learned of his whereabouts. There's strong implication that he was somehow in fear of his safety because of something that might result from that.

70.

"THE COURT: Right. I understand—

"[ARGUELLO'S COUNSEL]: The jury may not be aware there's absolutely zero threat no matter—I didn't know who it was. I didn't know what city the guy was in.

"THE COURT: I have no problem with your follow-up questions on that, but a lot of your questions were just not really for the jury to consider, such as what would happen if—for a violation of any kind of court order. I think that was clearly outside.

"[ARGUELLO'S COUNSEL]: Well, I think—

"[PROSECUTOR]: It's beyond that though Judge. I'll let you finish, but I want to make a record.

"[ARGUELLO'S COUNSEL]: —there was, in fact, zero threat of harm. The defense attorneys and their agents are permitted by law from disclosing the address; if they don't know that, they may well believe that the investigator's free to go tell … anyone else what the address is."

Defendant's counsel then argued the prosecutor opened the door to questioning about the defense investigator through a "rehearsed exchange" regarding W.H.'s address being compromised. Defendant's counsel argued, "The direct implication is that defense counsel can't be trusted nor can the defendants, so that goes to them being dangerous, gangsters, danger, killing, all these things. Again it's an effort to poison the jury about the whole side over here. So they've opened the door." Arguello's counsel suggested the "implication of impropriety by the defense" could be rebutted by the investigator testifying to the legitimate, legal reasons he may have had to go to W.H.'s address.

The court responded, "The only reason the whole thing came up was because it had to do with monies, it had to do with extra monies that were paid to relocate him again. I don't think we need to get into a separate trial why he was relocated. And I do agree with you that the very line of the responses about his … safety and the defense I can clearly understand."

Zapien's counsel then argued the issue of W.H.'s safety being compromised was "highly offensive and prejudicial to the defense, and I think we should be allowed to go

71.

into it." Arguello's counsel then stated he only planned to ask Hicks whether he received any reports from W.H. of any threats from any of the defendants. The prosecutor and the court agreed that question was proper. In response to such questioning, Hicks testified W.H. never reported receiving threats from any of the defendants before he was relocated a second time.

## B. Standard of Review

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza*, *supra*, at p. 700.) "'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.'" (*People v. Hill* (1998) 17 Cal.4th 800, 820.) An exception is made if a timely objection or request for admonition would have been futile, or if "'"an admonition would not have cured the harm caused by the misconduct."'" (*Ibid.*) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of

the jury.'"  (*People v. Green* (1980) 27 Cal.3d 1, 27, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 241.)

### C.     Analysis

Defendant argues the prosecutor violated her duty not to admit inadmissible evidence and by attacking the integrity of defense counsel by eliciting Hicks's testimony that W.H. was relocated because the "defense attorneys" "compromised" W.H.'s address. He contends, when defense counsel "tried to obtain information from Hicks to rebut the appearance of impropriety created by the prosecutor, she objected numerous times." Then, the defense attorneys objected on various grounds and, though defendant's counsel did not use the words "prosecutorial misconduct," there can be no doubt the court understood his objections as such.  He also contends the prosecutor should have recused herself from prosecuting defendant because "she and her office simultaneously investigated and prosecuted Carson during [defendant's] trial," and she prosecuted both cases.  The People respond evidence regarding W.H.'s relocation and the reasons for it was not relevant to any contested issue at trial.  However, the issue of money was brought up by defense counsel in cross-examination and "[t]he prosecutor's follow-up questions about [W.H.] being given money to relocate was a reasonable response to that line of questioning."  They deny the prosecutor's conduct was deceptive or reprehensible and assert it was not misconduct for her to fail to recuse herself.

#### 1.     *The prosecutor did not engage in prejudicial misconduct in her redirect examination of Detective Hicks*

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel."  (*People v. Hill*, *supra*, 17 Cal.4th at p. 832.)  And, "'[i]t is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony."'"  (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)  Under certain circumstances, however, a defendant may "open the door" to the introduction of evidence that has been otherwise excluded.  (See *People v. Rowland* (1992) 4 Cal.4th

238, 275 ["A prosecutor, of course, may seek to disprove on cross-examination what defense counsel sought to prove on direct examination"]; *People v. Blanco* (1992) 10 Cal.App.4th 1167, 1176 ["The defense choice of strategy often makes admissible in rebuttal certain evidence which would not be admissible in the prosecution's case-in-chief"].)

Assuming, arguendo, defendant's first claim of prosecutorial misconduct was adequately preserved, we reject it on its merits. Here, defense counsel questioned Detective Hicks at length regarding additional payments given to W.H. Accordingly, the prosecution was entitled to clarify the reason for the additional payments to W.H. (See *People v Page* (1980) 104 Cal.App.3d 569, 574 [where defense counsel "opened the door" to testimony by his question on cross-examination, "[i]t was hardly 'misconduct' for the prosecutor to seek clarification of the response through further questioning"].) And even if counsel's question regarding who compromised W.H.'s location was irrelevant or improper, we cannot conclude this question in context amounted to deceptive and reprehensible conduct or that defendant was prejudiced as a result. Defense counsel was able to clarify on cross-examination that W.H.'s address was learned of by a defense investigator who was under court order not to disclose the address to anyone outside of the defense team, including to the defendants. Defense counsel also elicited testimony from Hicks that he was unaware of any threats from any of the defendants against W.H. And we cannot conclude it is reasonably probable a result more favorable to defendant would have been reached without the alleged misconduct. (*People v. Tully*, *supra*, 54 Cal.4th at p. 1010.)

### 2. *It was not misconduct for the prosecutor to fail to recuse herself from defendant's case*

Defendant next argues the prosecutor's failure to recuse herself from this case amounted to prejudicial misconduct. He asserts she had "an actual conflict that required her to recuse herself because she and her office simultaneously investigated and

74.

prosecuted Carson during [defendant's] trial." He further contends the prosecutor had "personal animus towards Carson," and "vice ver[s]a," asserting the record reflects the prosecutor had an "axe to grind" against Carson and defendant suffered as a result. He argues the prosecutor should have recused herself when the investigation into Carson began. The People respond defendant forfeited his claim by failing to raise the issue below. They further contend his claim fails on its merits because there was no evidence the prosecutor was biased against defendant or that the ongoing investigation into Carson had any impact on defendant's case. They assert, the verdicts in this case were returned on September 28, 2012, but Carson was not even arrested in connection with the Kauffman murder until August 2015, almost three years later. Thus, there was no conflict of interest during defendant's trial. On reply, defendant asserts his motion for new trial based on prosecutorial misconduct preserved the issue.

Even assuming, arguendo, the issue was adequately preserved, the claim fails on its merits. Defendant fails to establish the prosecutor's failure to recuse herself during defendant's trial constituted misconduct. A "conflict" exists whenever there is a "'reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.'" (*People v. Eubanks* (1996) 14 Cal.4th 580, 592; see *People v. Conner* (1983) 34 Cal.3d 141, 148.) But the conflict is disabling only if it is "'so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.'" (*Eubanks*, *supra*, at p. 592; see *Conner*, *supra*, at p. 148; accord, § 1424 subd. (a)(1) [a motion may be filed "to disqualify a district attorney from performing an authorized duty" that "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial"]; see *People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 377.)

Here, despite defendant's assertions, there was no evidence the prosecutor had a conflict of interest during defendant's trial. To the contrary, the prosecutor represented she had no knowledge of the wiretap or investigation into Carson when the issue was

raised to the court. While defendant cites to a discussion in the motion for new trial regarding the prosecutor's alleged contact with witnesses in the matter related to Carson, there is no evidence cited in support of those statements, nor did the motion for new trial even allege when the alleged contact occurred.

To the extent defendant asserts the contentious nature of the trial establishes the prosecutor had a "personal animus" against his counsel, we disagree. "'[T]hat a public prosecutor might feel unusually strongly about a particular prosecution … does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution.' [Citation.] 'Zealous advocacy in pursuit of convictions forms an essential part of the prosecutor's proper duties and does not show the prosecutor's participation was improper.' [Citation.] Recusal is justified only when the prosecutor has 'an interest in the case extraneous to [his or her] official function.' [Citation.]" (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 376.) The record fails to support a conclusion the prosecutor had a conflict during the trial compelling her to recuse herself. Consequently, her failure to recuse herself did not constitute misconduct.

## VI.    Cumulative Error

Defendant argues the cumulation of the numerous errors in this case prejudiced him. Specifically, he asserts he was denied a fair trial by egregious governmental and prosecutorial misconduct, "fueled by a Judge who refused to act to protect [defendant]'s Fifth and Sixth Amendment rights." Here, however, there is no series of prejudicial errors to cumulate. Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

## VII. Prison Prior Enhancement Should Be Stricken

Defendant next contends his one-year prior prison term enhancement imposed pursuant to section 667.5, former subdivision (b) must be stricken under Senate Bill 136, which was signed into law on October 8, 2019, and became effective on January 1, 2020. The People concede Senate Bill 136 applies retroactively to this case and the prison prior enhancement should be stricken. (See *In re Estrada*, *supra*, 63 Cal.2d at p. 742.) On remand, we direct the trial court to strike this enhancement.

At the time defendant was charged, convicted, and sentenced, section 667.5, former subdivision (b) provided, in part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony …."

After defendant was sentenced, but while his case was still pending on appeal, the Legislature enacted Senate Bill 136. Effective January 1, 2020, subdivision (b) of section 667.5 provides, in pertinent part:

> "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code …."
> (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)

In other words, a prior prison term enhancement will only apply if a defendant served the prior prison term for a qualifying "sexually violent offense." The Legislature did not expressly declare or in any way indicate it did not intend Senate Bill 136 to apply retroactively. "When an amendatory statute … lessens the punishment for a crime …, it is reasonable for courts to infer, absent evidence to the contrary and as a matter of statutory construction, that the Legislature intended the amendatory statute to

77.

retroactively apply to the fullest extent constitutionally permissible—that is, to all cases not final when the statute becomes effective. [Citations.]" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 972.) Additionally, while defendant's appeal was pending, the Legislature enacted section 1172.75 (former § 1171.1), which further declares invalid any sentence enhancement imposed prior to January 1, 2020, pursuant to former subdivision (b) of section 667.5, except for those enhancements imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of section 6600 of the Welfare and Institutions Code, and provides for resentencing pursuant to that section.

Accordingly, because defendant's prior prison term was not served for a sexually violent offense, the related enhancement imposed pursuant to section 667.5, former subdivision (b) is now unauthorized and must be stricken on remand.

## VIII. Defendant's Remaining Claim Is Moot

Defendant also argues the matter should be remanded to permit the trial court to exercise its discretion regarding whether to strike or reduce the gang-related firearm enhancements. Because we are reversing these enhancements on other grounds and a new sentencing hearing will necessarily result, defendant may raise this argument below, if necessary.

### A. Applicable Law

In *People v. Tirado*, *supra*, 12 Cal.5th 688, the California Supreme Court held a trial court could strike a section 12022.53, subdivision (d) enhancement and, in its place, impose a lesser enhancement under section 12022.53, subdivision (b) or (c). (*Tirado*, at p. 697.) The *Tirado* court explained "courts are not categorically prohibited from imposing uncharged enhancements and … the power to do so is not conditioned on the charged and adjudicated enhancement being legally or factually inapplicable." (*Id*. at p. 699.) Furthermore, "the current language of section 12022.53" does not bar a court from

imposing an enhancement under section 12022.53, subdivision (b) or (c) when those enhancements are not specifically listed in the accusatory pleading. (*Ibid.*)

In so holding, the *Tirado* court noted, section 12022.53, subdivision (j) "is the subdivision that authorizes the imposition of enhancements under section 12022.53." (*People v. Tirado*, *supra*, 12 Cal.5th at p. 700.) Notably, section 12022.53, subdivision (j) provides: "For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact. *When an enhancement specified in this section has been admitted or found to be true*, *the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other law*, unless another enhancement provides for a greater penalty or a longer term of imprisonment." (Italics added.)

To determine whether subdivision (j) of section 12022.53 authorized the court to impose an enhancement under subdivision (b) or (c) after striking a section 12022.53, subdivision (d) enhancement, the *Tirado* court considered whether the existence of facts required by section 12022.53, subdivisions (b) and (c) were alleged and found true. (*People v. Tirado*, *supra*, 12 Cal.5th at p. 700.) The *Tirado* court concluded "those requirements were met here." (*Ibid.*) Accordingly, the *Tirado* court held: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53(b) or (c)." (*Ibid.*)

## B.    Analysis

Defendant asserts the court imposed 25 years to life on the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II, and 20 years to life on the

section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V. He notes "[e]ffective January 1, 2018, section 12022.53(h), allowed a court to exercise its discretion under section 1385 to strike or dismiss a firearm enhancement at the time of sentencing." Additionally, in 2022, the California Supreme Court held in *People v. Tirado*, *supra*, 12 Cal.5th 688 that trial courts also have discretion to impose a lesser firearm enhancement. Accordingly, he argues "[b]ecause nothing in the record indicates the trial court considered and rejected striking or imposing lesser firearm enhancements, the matter should be remanded for resentencing." The People agree the matter should be remanded to give the court an opportunity to impose a lesser included firearm enhancement under section 12022.53.

The Supreme Court has held: "A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, … the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

Here, the trial court sentenced defendant to additional 25-years-to-life terms on the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II and 20-years-to-life terms on the section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V without further comment. The record before us does not reflect the trial court knew it had discretion to impose lesser firearm enhancements at the time of sentencing; nor does it reflect a clear indication by the trial court it would not have imposed lesser enhancements if it had discretion to do so. However, as discussed, we are reversing count IX and the gang-related firearm enhancements on other grounds and striking the prison prior enhancement. Thus, a new sentencing will necessarily result. Should the

80.

gang-related firearm enhancements ultimately be reimposed, defendant may raise this contention at resentencing.

## DISPOSITION

We reverse count IX, the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II, the section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V, and strike the prison prior enhancement (§ 667.5, former subd. (b)).  The matter is remanded to the trial court for further proceedings.  The People shall have 60 days from the date of the remittitur in which to file an election to retry defendant on count IX, the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II, and the section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V.  If the People elect not to retry defendant on this count and these enhancements, the trial court shall modify the judgment by striking count IX, the section 12022.53, subdivisions (d), (e)(1) enhancements to counts I and II, and the section 12022.53, subdivisions (c), (e)(1) enhancements to counts III and V and hold a new sentencing hearing.  In all other respects, the judgment is affirmed.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

SMITH, J.

81.